SOLOMON THALER, Respondent, v. F. W. NIEDERMEYER et al., Appellants.

St. Louis Court of Appeals, November 3, 1914.

1. **APPELLATE PRACTICE: Ruling Compelling Nonsuit: Prerequisites to Review.** Where, after unsuccessfully moving to set aside a nonsuit, plaintiff appeals, it is not enough that an exception be saved to the refusal to set aside the nonsuit, but it is also essential to a review, that an exception be saved to the action that compelled the taking of the nonsuit.

2. **NONSUITS: Voluntary or Involuntary: Absence of Exception.** Where plaintiff was compelled to take a nonsuit on account of the giving of peremptory instructions for defendants, and the court subsequently set aside the nonsuit and granted plaintiff a new trial, and defendants appealed from this order, the fact that the bill of exceptions filed by defendants did not show that plaintiff excepted to the court's action in giving the peremptory instructions did not change the nonsuit to a voluntary one, so as to preclude the court from setting it aside.

3. **APPELLATE PRACTICE: Matters of Exception: Prerequisites to Review.** Rulings of the trial court are not reviewable, on appeal, unless the appellant excepted thereto and preserved such exceptions in a bill of exceptions.

4. **NONSUITS: Right to Set Aside at Subsequent Term.** Where plaintiff took an involuntary nonsuit, with leave to move to set the same aside, and filed a timely motion for that purpose at the same term, which was duly continued to a subsequent term, the court retained jurisdiction of the cause during the pendency of the motion and had the power to sustain the motion at the subsequent term.

185MoApp17

5. **APPELLATE PRACTICE:** Scope of Review: Amendment Nunc Pro Tunc. Where the point was made on appeal that the case could not be considered because of the absence of an exception, and at the same time the main case was determined, the appellate court determined, on an appeal from an order overruling a motion to amend the bill of exceptions, *nunc pro tunc*, so as to show the exception, that the amendment should be made, and entered a judgment accordingly, *held* that the exception was alive in the appellate court, and that, with its appearance, the question raised concerning its absence disappeared from the case.

6. **FRAUD AND DECEIT:** Misrepresentations: Sufficiency of Evidence. In an action for damages sustained by fraudulently inducing an exchange of properties, evidence *held* sufficient to make a prima-facie case that plaintiff was induced to make the exchange, to his damage, by representations which defendants knew were false and which were made with the intent that he should rely thereon.

7. ————: ————: Materiality of Representations: Opinions. Where defendants, in order to induce plaintiff to exchange a flat building for a farm, falsely represented that the farm was actually rented for a certain year for a certain amount, cash rent, and showed plaintiff a note executed by the alleged tenant for such amount, when, in fact, the note was a mere blind and the tenant was in possession as a "cropper," such representation was material and not a mere expression of opinion, and hence was actionable.

8. ————: ————: Negligence as Defense. The law does not permit the guilty party to escape the consequences of his fraud merely on the ground that the other party was negligent or foolish in believing and relying upon the false statements made.

9. ————: ————: Warning that Representations were False. Where plaintiff had been furnished, as he believed, positive and convincing proof that a farm defendants were seeking to exchange with him for other property was actually under lease for a certain year at a rental for a certain amount, and nothing appeared to challenge the truth thereof, plaintiff was not bound, as a matter of law, to place no reliance thereon, merely because, after an understanding had been reached respecting the trade, he was advised by his attorney that, in the latter's opinion, the farm was much less valuable than it was represented to be and could not be rented for such sum.

10. ————: Necessity of Showing Injury. Fraud must concur with damage to be actionable.

Appeal from St. Louis City Circuit Court.—*Hon. William M. Kinsey,* Judge.

AFFIRMED.

*E. W. Hinton* and *McBaine & Clark* for appellants.

(1) The nonsuit in this case, though called involuntary, was voluntary. No exception was taken to the ruling of the court in directing a verdict for defendants, and hence it was error to sustain a motion to set it aside. There is, therefore, nothing before this court for review, and the judgment for defendants should be affirmed. Lewis v. Mining Co., 199 Mo. 469; Allen v. Railroad, 141 Mo. App. 589; Montei v. Railroad, 130 Mo. App. 149; Adamson v. Railroad, 126 Mo. App. 127; Jones v. Lime Co., 128 Mo. App. 345; Searle v. Barrington, 2 Strange, 826. (2) The verdict was properly directed for defendants, because the representations complained of were mere extravagant puffing of value, matters of opinion, as to value, or dealers' talk such as no reasonable man can or does rely on. Cornwall v. Real Est. Co., 150 Mo. 377; Moody v. Baxter, 167 Mo. App. 521; Fruit & Truck Assn. v. Hartman, 146 Mo. App. 167; Bradford v. Wright, 145 Mo. App. 623; Lewis v. Land Co., 124 Mo. 672; Bishop v. Small, 63 Maine, 12; Northing v. Wright, 72 Ill. 390; Farr v. Peterson, 91 Wis. 182; Parker v. Moulton, 114 Mass. 99; Palmer v. Brownell, 131 Mass. 138; Press v. Hair, 133 Ill. App. 536. (2) The plaintiff was not entitled to rely on the statements aforesaid without making use of the means of informations at hand, viz., his own eyes, matters of common information, and the advice of his own attorney; and the rule is that if the buyer trusts to representations which are not calculated to impose upon a man of ordinary prudence, or if he neglects the means of information easily in his

reach, he must suffer the consequences of his own folly and credulity.    Camren v. Squires, 156 S. W. 773; Bradford v. Wright, 145 Mo. App. 623; Hines v. Royce, 127 Mo. App. 718; Dunn v. White, 63 Mo. 181.    (4) A jury could not rationally have found that plaintiff relied on the representations in question and was deceived.    There can be no recovery where no reliance is placed upon the alleged false representations.    And as that question here is not open to a reasonable difference of opinion the demurrers were properly sustained.    Brown v. Lead & Zinc Mining Co., 194 Mo. 705; Nobles v. Brady, 160 Mo. App. 323.

*Alexander Young* and *Chas. E. Morrow* for respondent.

(1)    (a)    The court should amend the bill of exceptions to show the plaintiff's exception to the giving of the instructions in the nature of demurrers to the evidence as contended by the plaintiff in the proceedings for that purpose now being heard with this case. (b)    The court having sustained plaintiff's motion and set aside the nonsuit, it is not necessary that an exception appear in the bill of exceptions on defendant's appeal.    Heitland, etc., v. Culver, 164 S. W. 708; Green v. Railroad, 211 Mo. 18.    (c)    The nonsuit was involuntary.    What transpired amounted to an exception by plaintiff to the action of the court in giving the peremptory instructions to find for the defendants.    An exception to the ruling does not have to be expressed in the phrase "I except."    Any other clear expression that the party does not acquiesce in the ruling and thereafter expects to have the ruling reviewed is sufficient.    Snelling v. Yetter, 49 N. Y. Supp. 917; Elsner v. Supreme Lodge, 89 Mo. 640.    (2)    The defendants falsely represented to the plaintiff that the farm in question was worth $16,000, and that it was rented then to a good and responsible tenant for the annual

rental of $1600, and that the said land was in good condition, and was always rented for that sum, that the farm was producing and had been producing twenty barrels of corn to the acre. These representations were specific statements of material facts, and removed the representation out of the realm of mere opinion and are actionable. Hess v. Draffen, 99 Mo. App. 586; Foundry Co. v. Heskett, 125 Mo. App. 521; Fall v. Horbeck, 132 Mo. App. 593; Brownlee v. Hewitt, 1 Mo. App. 360; Clinkenbeard v. Weatherman, 157 Mo. 113; Tinker v. Kier, 195 Mo. 113; Brolaski v. Carr, 127 Mo. App. 286. (3) Defendants intentionally deceived plaintiff by a positive willful fraud and cannot be permitted to say the plaintiff should not have believed or trusted him. Negligence of the other party will not bar relief. Cottrill v. Krum, 100 Mo. 397; Vells v. Adams, 88 Mo. App. 227; Pomeroy v. Benton, 57 Mo. 531; Wannell v. Kem, 57 Mo. 487; Nical v. Young, 68 Mo. App. 448; Savings Institution v. Burdick, 87 N. Y. 40.

ALLEN, J.—This is an action at law for damages alleged to have been sustained by the plaintiff by reason of false and fraudulent representations of the defendants in connection with a real estate transaction. Plaintiff suffered a nonsuit below, and this appeal is from an order setting aside the same, and granting a new trial, as to these appellants.

Because of questions raised here, we note the precise state of the record respecting the taking of the nonsuit and the setting aside of the same.

As instituted, the suit was against these appellants, Neidermeyer and Kline, and another defendant, an attorney. The trial was before the court and a jury, and at the close of plaintiff's case the court declared the law to be that the plaintiff could not recover, and gave peremptory instructions in the nature of demurrers to the evidence, separately offered by all three defendants. Thereupon plaintiff's counsel, after

amending his petition, by leave, reducing the amount of his claim for damages, stated to the court:

"Now, then, on the giving of this instruction, I take an involuntary nonsuit, and I ask leave to file a motion to set the same aside."

To this the court replied: "That may be done."

The record then states: "And thereupon the court gave said instruction, as requested, and the plaintiff took a nonsuit as prayed."

The judgment thereupon entered, recited the giving of the peremptory instructions, and that, "owing to the adverse rulings of the court, as aforesaid," plaintiff took a nonsuit.

Thereafter, in due time, during the same (February, 1912) term of the circuit court, plaintiff moved to set aside the nonsuit. This motion was continued, and was not passed upon until two terms later, to-wit, the June term, 1912, when the court sustained the motion and set aside the nonsuit as to the defendants Niedermeyer and Kline, and they appealed.

The bill of exceptions filed herein by the appealing defendants shows no exception saved by plaintiff to the giving of the peremptory instructions forcing the nonsuit. And thereby hangs a tale, not told in the record brought here by these defendants, but in that brought by plaintiff who appealed from an order overruling a motion filed by him to amend the aforesaid bill of exceptions, nunc pro tunc, to show that plaintiff in truth duly saved his exceptions to the action of the court compelling the nonsuit. Defendants Niedermeyer and Kline filed their bill of exceptions herein on August 30, 1912; and the record in plaintiff's appeal shows that, on March 10, 1914, plaintiff moved to amend such bill of exceptions in the manner above indicated. This motion was later overruled, plaintiff appealing; and the two appeals were here docketed and heard together. A separate opinion has been written disposing

of the question raised by plaintiff's appeal, to which we shall hereinafter have occasion to refer.

The controversy grows out of a transaction between plaintiff and the defendants, Niedermeyer and Kline, whereby plaintiff exchanged certain real property owned by him in the city of St. Louis for a farm in Boone county, Missouri. The title to the farm, it seems, was in defendant Niedermeyer when the negotiations were begun, but it is said that it had been previously sold to defendant Kline, though no deed thereto appears of record from Niedermeyer to Kline.

Plaintiff resided in the city of St. Louis, and Niedermeyer and Kline in Boone county, Missouri. Plaintiff owned an apartment building, consisting of four apartments, in the city of St. Louis, valued by him at $28,000. It appears that two of the apartments rented for $55 per month each, and the other two for $50 each. And plaintiff testified that but one was vacant at the time here in question. The property was encumbered by a deed of trust for $16,000.

Plaintiff testified that on or about January 1, 1909, defendant Kline called him by long distance telephone, from Columbia, Missouri, and inquired concerning plaintiff's said property, and said that he had a farm to trade therefor; that three days later Kline came to St. Louis, saw plaintiff and told him of the farm, saying that it contained one hundred and sixty acres, was an extra good farm, and brought in a rental of $1600 per year. After Kline had inspected plaintiff's property, plaintiff told him that he would let him know about the matter. On January 17, 1909, after receiving, as he says, many long distance telephone calls from Kline, plaintiff went to Centralia, Missouri, where he met both Kline and Niedermeyer, from which place the three went by train to Brown Station, and from there drove out to the farm. While at Centralia they conversed about the farm, and plaintiff says that Niedermeyer declared that the farm was worth $100 per

acre, a total of $16,000, but that Kline was going to marry a young lady with $30,000 in cash, and didn't "want to bother any more with farms."

Plaintiff says that they reached the farm between four and five o'clock in the afternoon, and stopped in front of the farmhouse near the road; that he saw a man in the yard, whom he afterwards learned to be one Brockman, who was living upon the place, and said that he would "go in and see the farm," but that Kline thereupon said to Niedermeyer: "You take Mr. Thaler around and show him the farm, and I will go in the house." And plaintiff says that thereupon Kline went into the house, and Niedermeyer drove plaintiff about twenty-five feet therefrom and showed him the farm; that a few minutes later, he and Niedermeyer went into the house, where plaintiff was introduced to Brockman, supposed to be the tenant.

According to plaintiff's testimony, while the four were seated before a fire in the house, plaintiff asked Brockman if he had the farm under lease, and Brockman replied that he had. Plaintiff then asked Brockman what rent he paid, and the latter said that he paid $1600 a year. Thereupon plaintiff asked him how he could afford to pay $1600 a year rent for such a farm, but, before Brockman had an opportunity to answer, defendant Kline "butted in," as plaintiff puts it, saying: "He has been raising twenty barrels of corn per acre. He gets $3 a barrel." And Niedermeyer spoke up and said: "We expect to get more this year. It brings him $60 an acre, and he pays $10 rent, and he has $50 left for his work." And plaintiff, who testified that he could not read English, says that thereupon Kline drew a paper from his pocket saying that it was a note for $1600 for the rent reserved under the lease to Brockman; that plaintiff then asked Brockman if it was his note, and Brockman replied that it was. Shortly thereafter plaintiff, Niedermeyer and Kline drove to Columbia, Missouri, and that night plaintiff

returned to St. Louis; it having been arranged that the three would meet later in St. Louis.

The supposed lease to Brockman was for the year 1909; and the note executed by Brockman for $1600 purported to be for the cash rent reserved for that year. Brockman was called by plaintiff as a witness in the case, and testified concerning this phase of the matter. He said that the "lease" was merely oral; that late in 1908, "when Kline bought the place," Kline wanted him to "tend to the farm," and that he moved into the house in the latter part of December, 1908. He said that the agreement between him and Kline, when he moved on the place, was that he was to have one-half of what he raised; that Kline was to give him $20 per month to live on, and to furnish him with teams with which to cultivate the ground, and that the $20 per month advanced him "was to be taken out after the crop was made." He testified that, in point of fact, he cultivated but forty acres during the succeeding year, i. e., 1909. He said that, prior to the acquisition of the farm by plaintiff, Kline spoke of selling the place and said that "he could make a sale at $100 per acre, provided he could rent the ground for $10 per acre." Brockman said that when plaintiff was at the farm, on January 17, 1909, and while Niedermeyer was showing plaintiff the place, Kline talked with him and said: "I believe I could make a sale if I could get $10 rent;" that he (Brockman) said that was "pretty high," and thereupon Kline said: "I will pay it, if you don't make it from the crop;" that Kline prepared the note for $1600, and that he signed it and gave it to Kline. He testified that nothing further was thereafter said about the note, except that when Kline later returned from St. Louis, he told the witness that the note had not been used, but that "different arrangements were made about the land."

The testimony of other witnesses, competent to speak thereupon, is to the effect that the farm, in point

of fact, was worth from $30 to $35 per acre; one witness putting it at $40 per acre, saying that would be "the top price." It appears that land in that vicinity usually rented for a portion of the crop raised, and not for cash rent, and that the farm in question had been thus rented theretofore, being parcelled out, as it seems, to different tenants. The evidence is further that the rental value of the farm did not exceed $400 a year. One witness said that it would rent for about $2 an acre, with perhaps $50 per annum additional for the use of the house.

It appears that, on January 22, 1909, plaintiff and the defendants Kline and Niedermeyer met in the city of St. Louis. An exchange of the two properties, i. e., the apartments for the farm, was agreed upon. Plaintiff's property was put in at a valution of $28,000, from which was to be deducted the incumbrance of $16,000 thereon, leaving an "equity" of $12,000. The farm was put in at $16,000, and as it was subject to a deed of trust for $3200, the "equity" therein was $12,800. It was upon this basis, as to respective values, that the trade was agreed upon. But plaintiff wanted $2000 in cash; and, in order to consummate the trade, defendants Niedermeyer and Kline agreed to furnish this. They thereupon took the Brockman note, which would have become plaintiff's property upon closing the deal, discounting it at eight per cent, and took back from plaintiff a second deed of trust upon the farm for the remainder of the money advanced. There were details relating to interest, taxes, etc., which need not be noticed.

On the morning of January 22, above referred to, plaintiff Niedermeyer and Kline appeared at the office of plaintiff's attorney in the city of St. Louis, who afterwards testified in the case. It appears that the deal had been arranged beforehand, and that the object of visiting the attorney was in regard to the execution of the papers. Plaintiff's said attorney, testi-

fied, however, that he talked with plaintiff, apart from the others, and told plaintiff that while he had not seen the farm, he was satisfied that it was worth nothing like $100 per acre, and that "unquestionably" plaintiff could not rent it for $1600 per year cash rent; that, judging from what he had been told, it might be worth $45 or $50 per acre, and that it would be doing well to get from $3 to $6 per acre cash rent therefor. He testified that plaintiff said that the trade had been arranged, and that he (plaintiff) would get $2000 in cash, which he greatly needed, and that he wanted badly to get rid of his apartments and must have some money. And he said that plaintiff called his special attention to the fact that the apartments were being traded at a valuation of $28,000. Plaintiff said that he did not have a private conversation with his attorney, and denied telling the latter that he needed money.

Later in the day, a written agreement was entered into between plaintiff and an attorney representing Niedermeyer and Kline. This attorney had taken title to the farm by deed from Niedermeyer, and he conveyed it to plaintiff, who, in turn, conveyed the apartment property to him. It seems that this was done because of a question which was raised relative to a possible claim of some real estate agent for commissions in the premises.

I. Appellants insist that the record before us shows that plaintiff took a voluntary nonsuit, since it reveals no exception saved by plaintiff to the ruling of the trial court in directing a verdict for defendants. It is said that, by failing to except to the court's ruling, the plaintiff must be regarded as having acquiesced therein, thereby rendering the nonsuit voluntary; and that therefore the court was not warranted in setting the same aside, and awarding plaintiff a new trial upon the ground that it was error to give the peremptory instructions; and that in any event the court was pow-

erless to set aside the nonsuit, under the circumstances, at a subsequent term.

Pursuing this argument it is pointed out that where no exception is taken to the action of the trial court in compelling a nonsuit, the propriety of the court's action will not be reviewed on appeal. But obviously this is pertinent only where plaintiff is appealing. It cannot be doubted that where plaintiff suffers a nonsuit below, and, after unsuccessfully moving to set the same aside, he appeals, then the failure of the record to show an exception saved to the action of the court in compelling the nonsuit is fatal, for there is then nothing before the appellate court for review. In such case, it is not enough that an exception appears to the action of the trial court in refusing to set aside the nonsuit. [See Lewis v. Mining Co., 199 Mo. l. c. 469, 97 S. W. 938; Allen v. Street Railway Co., 141 Mo. App. 586, 126 S. W. 254; Montei v. Railroad, 130 Mo. App. 149, 108 S. W. 1073.] But plaintiff has not brought this case here. This is defendants' appeal; and the principle involved in such cases as those mentioned above, relating to the right of an appellant to have the action of the trial court reviewed, on appeal, is not here applicable.

There can be no question whatsoever as to the nature of the nonsuit, no possible contention that it was voluntary, unless, as appellants assert, it is made so merely because of the failure of the record to show that plaintiff "excepted" to the court's action in giving the peremptory instructions. If this be so, then the loss of this exception, which it is said plaintiff failed to save, altered the entire character of the proceeding; and though plaintiff, compelled thereto by the giving of the peremptory instructions, prayed for an involuntary nonsuit, and the court solemnly granted an involuntary nonsuit, as prayed, nevertheless the absence of this exception gives to the nonsuit a character not intended below either by court or counsel, and the

record before us reciting that it is an involuntary nonsuit is false upon its face.

This question here involved was before us, in Heitland Grate & Mantel Co. v. Culver, et al., 181 Mo. App. 691, 164 S. W. 708, where we held, upon the authority of Green v. Terminal R. R. Co., 211 Mo. 18, 109 S. W. 715, that, inasmuch as the case was not here upon plaintiffs' appeal, plaintiffs' failure to save an exception to the action of the trial court in sustaining a demurrer to the evidence was not a matter of consequence. In other words, we held that, while it would have been fatal, had the record failed to show such exception where the trial court refused to set aside the nonsuit and the plaintiffs brought the case here on appeal, it was not so when that court afterwards set aside the nonsuit on plaintiff's motion, and the case was here on defendants' appeal.

Counsel for both appellants and respondent rely in some measure upon the opinion of LAMM, J., in Green v. Terminal R. R. Assn., supra. There plaintiff's case went to the jury, and the latter returned a verdict for the defendant. Plaintiff's motion for a new trial was sustained, and the defendant appealed. The new trial was granted upon one ground of plaintiff's said motion only, viz., that error had been committed in admitting certain evidence offered by the defendant. Upon appeal, however, plaintiff invoked the doctrine that even should the Supreme Court hold that there was no error in admitting the testimony in question, yet if there were other good reasons appearing on the record why the court below should have granted a new trial, its order in doing so should be affirmed. And it was argued that error was committed in giving two certain instructions for the defendant. It was held that the plaintiff could not avail himself of the alleged errors in giving the instructions in question, on that appeal, because the record did not show that the plaintiff had objected or excepted to the giv-

ing of any instructions for defendant. On the other hand, though the record showed no exceptions saved by plaintiff to the overruling of his objections interposed to the admission of the testimony, for supposed error in admitting which the court had granted the new trial, it was said that, since it was defendants' appeal, "and as the trial court presumably acted under its own ruling and saw the exception in its mind's eye though none was made, and undertook to correct what it believed its own error," the matter would be considered on the merits. It was this ruling which we followed in Heitland Grate & Mantel Co. v. Culver, supra, and we think that it is applicable and controlling upon the record now before us; and that what was said in the Green case relative to the plaintiff's right to have certain other alleged errors reviewed is not here pertinent. As to the latter, plaintiff, though not an appellant, was in the position of asking the appellate court to review alleged errors of the trial court other than the one which that court itself saw, as it thought, and which alone it attempted to correct by granting the new trial. In this way plaintiff himself was challenging the action of the trial court, and seeking to convict it of error. But the matter is not so presented here. The plaintiff is not here challenging any action of the trial court, or seeking to convict it of any error. Defendants' appeal is from the action of the court below in undertaking to correct what it believed to be its own error; and no other question is involved.

We think that the absence of an exception, under the circumstances, cannot affect plaintiff's case before us; nor do we perceive how it could have the effect of turning the involuntary nonsuit into a voluntary one, though it would have precluded plaintiff from having the court's action reviewed here had the nonsuit not been set aside and had plaintiff then appealed—for the absurd rule of appellate practice still prevails that, no matter how much one may object below, or how plain

it may be that he does not assent to or acquiesce in a ruling which his counsel has used every means within his power to prevent, nevertheless if the record does not show an "exception" saved to the court's action, and this too in the proper place in the record, to-wit, the bill of exceptions, he may not complain of the ruling on appeal.

Appellants further rely upon what is said by the Kansas City Court of Appeals in Adamson v. Railroad, 126 Mo. App. 127, 103 S. W. 1097. There, as here, a nonsuit was set aside by the trial court and the defendants appealed. The record disclosed, however, and clearly, that the nonsuit was voluntary. But it was further said that, since no exception was saved to the supposed ruling, plaintiff's nonsuit must, for that reason also, be regarded as voluntary. In support thereof the court quotes from Lewis v. Mining Co., supra, where the question arose upon the *plaintiff's* appeal. But, regardless of this, the case is not persuasive, in view of the ruling in Green v. Terminal R. R. Assn., supra, which had not been decided when the opinion was written in the Adamson case.

A further insistence is that, absent an exception, plaintiff's motion to set aside the nonsuit did not serve to carry the matter over beyond the term; and that the court below was powerless to act at a subsequent term. But we cannot assent to this. It is our opinion that, during the pendency of this motion, which was duly continued from term to term, the court retained jurisdiction of the cause, and had the power at a later term to make the ruling which it made, undertaking to correct its own error. [See State ex rel. Lynch v. Taylor, 183 Mo. App. 441, 166 S. W. 1071.]

• We have considered it advisable and proper to pass upon the question above discussed in the light of the record brought here by the defendants. But, as we have said, plaintiff has appealed from the action of the court in refusing to amend the bill of exceptions

*nunc pro tunc.* Among other things it appears that the judgment entered by the clerk upon the giving of the peremptory instructions and the taking of the non-suit, recited that plaintiff duly excepted to the giving of the instructions. In a separate opinion, disposing of that appeal, we have held, as we hold here, that the clerk's entries, in the very judgment itself, furnished sufficient evidence, and evidence of the requisite high character, to justify and authorize the amendment of the bill of exceptions *nunc pro tunc.* We have therefore reversed the ruling of the court below in the premises, and entered judgment here amending the bill of exceptions accordingly. The exception is therefore here, alive and vigorous; and with its appearance the question raised by appellants concerning its absence disappears from the case.

It is to be regretted that the state of the law is such as to furnish ground for any possible contention on this phase of the case—one in no manner going to the merits of the controversy, or affecting the substantial rights of the parties. The learning, acumen and industry of counsel are worthy of a better cause; and an appellate court may devote its time to better purposes.

II. The evidence adduced by plaintiff in our opinion clearly makes out a prima-facie case, for it tends to show false representations of facts made by these appellants, knowingly made and with the intent that they be relied upon by plaintiff, and that they were so relied upon by plaintiff to his damage. Reviewing the evidence adduced, one cannot escape the conviction that it shows, prima facie, actual false representations as to existing facts, as distinguished from mere matters of opinion. It was represented that the farm for which plaintiff was trading was actually leased to Brockman for the year 1909 for $1600 cash rent; and in proof of this a note was shown plaintiff for $1600

signed by Brockman. In point of fact, it appears that the farm, as a whole, was not leased to Brockman at all, and certainly not for $1600 cash rent. On the contrary, Brockman was upon the place under an arrangement whereby he was to cultivate some of the land, giving one-half of the crop as rent, being paid $20 per month for his living expenses to be deducted from his portion of the crop at the end of the year. And the entire transaction, attending the execution of the note, as gleaned from the testimony of both plaintiff and Brockman himself, was one concocted in fraud to induce the false belief on plaintiff's part that the farm was actually under lease for the particular year for a cash rental of $1600. Brockman's testimony is that appellant Kline told him, in effect, that he need not regard the note as a binding obligation; that its purpose was merely to give color to a false claim that the farm was leased for a cash rental of $10 per acre. Brockman signed the instrument early in 1909, and heard nothing more from it up to the time of the trial below, except that Kline told him, after returning from St. Louis, that the note had not been used, and that "different arrangements were made about the land."

And knowing the circumstances under which the note had been given and the *mala fides* of the transaction attending its execution, if plaintiff's evidence be true, these appellants professed, throughout the deal with plaintiff, to treat it as a binding obligation on the part of Brockman, and as actually being of its face value. And pursuing this course they went through the form of discounting the note in order to consummate the trade; though Brockman's testimony is that he was never thereafter called upon to pay it.

It may be that some of the statements said to have been made by these appellants, though false, are not actionable, for the reason that they are to be regarded as expressions of opinion; though we decided nothing

185MoApp18

as to this. Whether a representation is one of fact, or is to be taken as a mere expression of opinion, is often a close question, depending upon all of the facts and circumstances involved. And it is said that representations as to value may, under some circumstances, become more than mere expressions of opinion, and afford ground for relief to one who has relied upon them. [See Stonemets v. Head, 248 Mo. 243, 154 S. W. 108,. where these questions are discussed.]    But in our judgment this case presents no such difficulties. The false and fraudulent representation, said to have beeʌ. made, to the effect that the farm was actually rented for the year 1909 for $1600 cash rent is, we think, so clearly not a mere expression of opinion as to put that matter beyond dispute.    It pertained to a material question of fact. It was wholly and utterly false; and the note transaction was, according to the evidence adduced, conceived in fraud for the purpose of substantiating this false assertion.    Neither do we regard such a representation, so made, as coming within the realm of "puffing" statements, as appellants contend, upon which plaintiff. had no right to rely. The statement alone of the facts pertaining to the representation in question is sufficient on this score.

But it is said plaintiff was not entitled to rely upon the representations made to him by the appellants, for that they were not calculated to impose upon a man of ordinary prudence. But in a case such as this the law does not permit the guilty party to escape the consequences of his fraud merely upon the ground that the other party was negligent or foolish in believing and relying upon the false statements made. This doctrine is fully expounded in Judd v. Walker, 215 Mo. 312, 114 S. W. 979. See, also, Forman v. Davis, 229 Mo. 27, 129 S. W. 221.

It is true that plaintiff's attorney testified that he warned plaintiff not to rely upon the representations respecting the value of the land, or its income or ren-

tal value. Plaintiff disclaims having had a private con-
ference with his attorney, but regardless of this, the
matter is not here controlling. Plaintiff, according to
the evidence adduced, having been furnished, as he
thought, positive and convincing proof that the farm
was actually under lease for the year 1909, at a rental
of $1600, and nothing appearing to challenge the truth
of this, it cannot be said, as a matter of law, that he
could place no reliance thereupon, because of his at-
torney's advice, which, it seems, came after the parties
had reached an understanding respecting the trade.

It also said that the evidence shows that plaintiff
did not make the trade in reliance upon the alleged
false representations. But it is quite clear that we
could not so declare as a matter of law.

It is also true that, to be actionable, fraud must
concur with damage. [See Stacey v. Robinson, 184
Mo. App. 54, 168 S. W. 261, and cases cited.] But
from the foregoing statement of facts it will be seen
that the evidence made a sufficient prima-facie show-
ing as to this.

We are of the opinion that the trial court com-
mitted no error in granting plaintiff a new trial as to
these appellants; and that its action in so doing should
be affirmed. It is so ordered. *Reynolds, P. J.,* and
*Nortoni, J.,* concur.