Robert J. BAKER, Respondent,

v.

Vern T. BICKEL, Appellant.

No. 50148.

Supreme Court of Missouri.

Division No. 1.

Dec. 14, 1964.

Motion for Rehearing or to Transfer to Court En Banc Denied
Jan. 11, 1965.

William M. Howard, Bryan, Cave, Mc-Pheeters & McRoberts, St. Louis, of counsel, for respondent.

H. Jackson Daniel and Bernard A. Ruth-meyer, Jr., St. Louis, for appellant.

HYDE, Presiding Judge.

Action for damages for false representation in which plaintiff sought both actual and punitive damages. Plaintiff had verdict and judgment for $18,500 and defendant has appealed.

Plaintiff and defendant were friends in high school around 1940 and remained friendly seeing each other occasionally thereafter. In November 1957, after five years' employment as a general supervisor with General Motors, plaintiff left to come back to Kansas City. He went to see defendant and was offered a position in his business of organizing and operating health studios in which memberships were sold to the public. These studios were equipped with exercise machines and individual programs for members were designed for body development and health of members by the studio officers. Memberships were sold on an annual basis, a term of years or for lifetime, with emphasis on long term and life memberships. Plaintiff started as an instructor, soon becoming a studio manager in Kansas City, then going to Chicago as a district manager. At the time of his employment, there had been discussion of plaintiff obtaining an interest in the organization and in 1958 when corporations were created to operate two studios in St. Louis (one for men and one for women) plaintiff went there as manager and became vice-president of each. On January 23, 1959, defendant sent plaintiff the following letter, containing the alleged misrepresentation on which this suit is based: "Dear Bob: Here is a subscription agreement to the thirty per cent equity in each of the studios. You set up the payment arrangement to suit yourself. *We have a(n) $80,000 investment in those two clubs. Thirty per cent of that would be $24,000, so the $2400 you are paying is ten per cent of cost only.* The stock purchase agreement will protect you 'income tax' wise on this difference in cost and what you pay. Send these back when you wish. You can pay it off sooner if you like. The sooner the better as far as you are concerned. If you leave for any reason, I'll see that you get back any money you have invested. (Signed) Vern Bickel." (Emphasis ours.)

Plaintiff bought the stock on May 4, 1959, signing on that date the subscription agreements (one with each St. Louis Studio corporation as seller) which provided that if the buyer decided to sell the stock purchased he should first offer it to the corporation which had the right to purchase it within 90 days for the amount paid to it by the buyer "plus any increase in value of such stock since the date said stock was purchased up to the time written notice was mailed as required under this agreement to be determined by the corporation's public accountant." On advice of an attorney consulted by plaintiff before he purchased the stock a provision was added to the subscription agreements that the 30 shares he was buying in each corporation "will always equal 30% equity unless approved in writing by 2nd party." Plaintiff said he purchased the stock "on the potential rather than the actual value of it * * * potential earnings"; and that "the net assets worth *are* inconsequential of the earning power to some degree," but "this business is based on the person."

Plaintiff said he asked no questions of defendant about the purchase, but did advise with an attorney about stock purchase procedures. He stated that he did not examine the books and records of the corporations before the purchase but, accord-

ing to defendant, plaintiff saw the corporation records and spent considerable time with the bookkeeper. Plaintiff stated that he relied only on the letter from defendant. Between the offer of the stock in January and the purchase in May, plaintiff received profit and loss statements and he was shown what he was told was a trial balance sheet. During his employment plaintiff frequently submitted corporate financial statements to lending institutions, in discounting corporate paper, and these showed the capital investment. He was never refused any records or books, but he said he made no effort to examine the books until after he left the employment. He testified that he did not consider the $80,000 representation unbelievable in view of the appearance and condition of the studios, their furnishings and equipment. Plaintiff also testified that one of the "biggest things" he relied on was his confidence in defendant and in his integrity and good reputation for integrity. He stated that if he had examined the books he would not have understood them. He also said that if he did not feel that he could rely on the truth of the statement (defendant's), or if he had to have an expert examine the books, he would not have been working for defendant in the first place. Plaintiff paid the $2,400 in May 1959, and received a $4,500 dividend in October 1959. Plaintiff does not claim this dividend was improperly paid and he refused to sell the stock to defendant for $2,400 when he left his employment voluntarily near the end of 1959 because of the health of his daughter and the long hours of his work. (Defendant testified that plaintiff said it was worth $5,000 to him.) Plaintiff said he did not know the representation was false until the next year after leaving the company when he was told by defendant that the stock was worthless.

Thomas H. Wolff, a public accountant, testified to the effect that at the time of the alleged misrepresentation the books indicated an original investment of $2,000 in capital stock ($1,000 for each corporation) and that the net worth of the two companies (on the basis of assets less amounts due creditors) was $41,555.97 on June 30, 1959; that the book value of the stock owned by plaintiff would be thirty per cent of the net worth, which would be $12,466.79; that assuming capital stock of $80,000, as the investment mentioned in the letter, rather than $2,000, as reflected by the books, the net worth would be increased by $78,000, thirty per cent of that total of net worth would be $35,866, and the difference between plaintiff's interest in the two resulting net worths would be $23,400. He also testified that the books did not reflect accurately the financial condition because they did not state any liability for future service due on long term memberships.

From defendant's testimony it appears that the procedure followed was to create separate corporations to operate studios in each city, there being twelve in 1959, with a management corporation as the majority stockholder in each. The management corporation acted as banker for the others receiving their funds and paying their bills. Defendant and his mother owned a majority of the stock in the management corporation. Key men in the local corporations met with defendant and established selling methods, record keeping and other business procedures, with defendant having a veto power because of his majority stock ownership. Defendant's testimony as to the St. Louis operation was that, after he had been in the health club business in Kansas City for several years, he became a regional manager for the Houston Health Club and formed the two St. Louis clubs, leasing a building for them and supervising its remodeling and the purchase and installation of equipment. After three months' operation for the Houston organization, defendant took it over organizing the two operating corporations in 1958. Defendant's version of the meaning of the statement in his letter to plaintiff of an $80,000 investment was that this was the cost of the remodeling done and equip-

ment purchased. Defendant said the actual cost was $128,482 and he was making a conservative estimate in his letter. His testimony is not clear about the Houston Club's participation in this. He said Houston was willing to back it at the start but that membership sales were so good that Houston advanced nothing. He also said, "Houston had paid, according to our records, had about $97,000 before we even took the clubs over"; and that "the Houston Company took in the income and paid the bills on that until we had paid off nearly $100,000, at that time we formed the corporations and took over the assets." On cross-examination, defendant said they paid Houston $1,000 for these assets and they were not shown as assets of the St. Louis corporations at cost because Houston had paid for them. Apparently he meant that Houston paid the cost from the memberships he sold but that his St. Louis corporations took over the assets and the membership obligations. The business was closed in the fall of 1960 when a chattel mortgage on equipment and furniture was foreclosed. Defendant admitted that all membership sales were shown as income of the year in which they were sold with nothing as to future liability shown on the books, although they were discounted at finance institutions to get cash. Defendant also admitted that memberships, including life memberships, were sold up until two days before the doors were closed because of the foreclosure.

Defendant's first point substantially is that the trial court erred in entering judgment on the jury verdict because the verdict was contrary to plaintiff's own evidence, also claiming in any event it is excessive because of plaintiff's accountant's testimony as to its book value. Defendant's argument on this point is: "The verdict of the jury was based on testimony adduced from plaintiff's witness, Thomas H. Wolff, to the effect that assuming $80,000 rather than $2,000 was the amount of the investment, in capital stock only, * * *. The fact that the representation was made

about the investment, along with the later reference to 'cost', negate any interpretation that the representation referred to the amount of capital stock in the corporation. There is no reasonable basis for a jury or any reasonable man to conclude that the represented $80,000 investment was an investment in capital stock only."

Defendant filed a motion for directed verdict at the close of plaintiff's case and at the close of the whole case and alleges as error in his motion for new trial the refusal to direct a verdict. As stated defendant, in his brief, contends the verdict was contrary to plaintiff's own evidence saying the alleged fraudulent misrepresentation cannot reasonably be interpreted to refer to a capital stock investment. We think this is sound and although defendant has not properly preserved it by specific allegations of his motion for directed verdict, motion for new trial and points and authorities in his brief, we can consider it under Rule 79.04, V.A.M.R. See Oganaso v. Mellow, 356 Mo. 228, 201 S.W.2d 365; Fletcher v. North Mehornay Furniture Co., 359 Mo. 607, 222 S.W.2d 789; Millar v. Berg, Mo.Sup., 316 S.W.2d 499, and cases cited. We do so because, as hereinafter stated, we find it was prejudicial error to give Instruction No. 6 on plaintiff's request.

The theory of plaintiff's petition seems to be that the reference in the letter of January 23, 1959, to an $80,000 investment was a representation that this was the capital stock investment in the two corporations when the capital stock of each was $1,000. Plaintiff's evidence from his accountant was on that basis and the measure of damage instruction, No. 9, given by the court at plaintiff's request authorized as damages "such sum, if any, as represents the difference between the actual value of the said stock on May 4, 1959 and the value that the said stock would have had on said date if the false representation made by Defendant, if any, had been true, less the dividend of $4,500 received by Plaintiff on said stock."

Plaintiff's evidence of the value of the stock on that date was the testimony of his accountant of the book value of the stock based on net worth of the companies as shown by their books on June 30, 1959. Plaintiff argues that the stock could have been found worthless because his accountant testified that liabilities for future performance of long term memberships were not shown on the books. However, while the accountant said the net worth of the corporations would be considerably less than the amount reflected on the books, because of these liabilities on memberships, he also said: "I have no way of computing it." Moreover, plaintiff then actively engaged in the management of these corporations, knew about the business they were getting and said he made the purchase because of its potential for earnings, as to which he had knowledge because he was conducting its sales, and when plaintiff left the company in November 1959, he would not accept defendant's offer to pay him $2,400 for it. It appears that the accountant's testimony assumed a $2,000 value for the actual stock issued and $80,000 as the value of the stock considered as represented to be in existence as the capital stock of the two companies; and the jury's verdict was based on these figures.

■ Although the business seems to have been operated on an unsound basis, our conclusion is that the letter of January 23, 1959 cannot reasonably be construed as a representation that the capital stock of these two corporations was $80,000. The meaning of the term "investment" must be determined from the whole letter, the accompanying stock subscription agreements and surrounding circumstances. Its reference to this amount as "investment in those two clubs" and to the price asked as "ten per cent of cost," at most, could be construed as cost of assets owned only, although defendant apparently included in it also all expenses of remodeling the leased building as well as cost of equipment purchased. Moreover, plaintiff, as vice-president, was managing the corporations involved, getting a salary of $18,000 a year. Plaintiff was a graduate of William Jewell College with an A.B. degree and had taken a course in accounting at Kansas City Junior College, had five years' experience with General Motors in a supervisory position paying a salary of $10,000 a year and had owned General Motors stock. He had received the monthly profit and loss statements of these two corporations, got their financial statements to present to banks and finance companies and presented them to sell notes of purchasers of memberships, and used advertising saying that each studio had from $30,000 to $60,000 equipment. He waited from January to May before accepting defendant's offer and during that time consulted an attorney on whose advice he added the provision that his interest should always be 30%. All of this shows that the figure stated in the letter reasonably could not have been construed by him as being the amount of the capital stock of the two corporations and he did not actually say it was. He said he relied on the $80,000 figure as invested in assets and never said he thought that was the amount of the capital stock. Plaintiff's attorney offered in evidence his following deposition statement: "Q. You didn't know whether there was $80,000 worth of assets in these two St. Louis stores (studios) or not? A. I assumed that to be true." Consideration of the entire record convinces us that plaintiff reasonably could only have understood the representation to be cost of assets. The verdict and judgment based on the theory of a representation of $80,000 in capital stock is not supported by substantial evidence and cannot stand. The computations made by plaintiff's accountant were solely on that theory and therefore the judgment must be reversed.

■ Nevertheless, defendant was not entitled to a directed verdict because facts are stated in plaintiff's petition and shown in evidence which could be construed as

showing a false representation of the amount invested in assets which he might be entitled to submit to the jury. For the reasons hereinabove stated our view is, particularly because of the reference to "cost," that it does not seem reasonable to construe the representation as one of net worth of the corporations. Nevertheless, such recent cost would be material in determining net worth. Plaintiff's accountant's testimony was that the books of the two corporations showed a total cost of fixed assets of $35,077.23, which he said included furniture, fixtures, gym equipment and leasehold improvements to the leased premises; and the jury could have found this was the true amount of such investment instead of $80,000, as there was no claim that any of the original assets, all paid for in 1958, had been sold, transferred, removed or lost. Apparently defendant was including in the $80,000 figure cost of assets and improvements made by the Houston Club when he began operations in St. Louis for them and for which his corporations paid Houston $1,000. Defendant's testimony did not show how the original costs paid by Houston could be amounts invested by his corporations. Considerably lower actual cost would make a difference in the net worth of his corporations and the value of their stock. See Zeitinger v. Steinberg, Mo.App., 277 S.W. 953, 957; see also Laird v. Keithley, Mo.Sup., 201 S.W. 1138, 1143; Wagner v. Binder, Mo.Sup., 187 S.W. 1128, 1147–1150; Shepherd v. Woodson, Mo.Sup., 328 S.W.2d 1, 6, 7, and cases cited; 23 Am.Jur. 834, Fraud and Deceit, Sec. 63; 37 C.J.S. Fraud § 57b(2), p. 342. A representation as to the amount invested would be a representation of a fact and not a representation of value as defendant contends; and therefore is not within the rule of State ex rel. Burton v. Allen, 312 Mo. 111, 278 S.W. 772; Weitzman v. Weitzman, Mo.Sup., 156 S.W.2d 906, cited by defendant. Plaintiff's evidence did not show what difference this would make in the value of the stock but it seems reasonable that, if the cost of the corporations' assets

was less than half of the amount defendant represented had been invested in them, this would make some difference in the value of their stock. It would make a difference in the book value of the stock and that could have some bearing on its actual value. This representation was made in less than a year from the time the St. Louis corporations commenced business and the record shows no change of conditions up to the time plaintiff purchased the stock. "According to the weight of authority generally, the proper measure of damages in a case of this kind is that 'the defrauded party is entitled to the difference between the actual value of the property and what its value would have been if it had been as represented.' Annotation, 124 A.L.R. 37, 38. This is often referred to as the majority or 'Benefit of the Bargain' rule." Smith v. Tracy, Mo.Sup., 372 S.W.2d 925, 938, and authorities cited. Plaintiff may be able to show value greater than the amount of the dividend received if the cost of assets owned had been $80,000, although we said in Smith v. Tracy, 372 S.W.2d 1. c. 939, in the absence of other evidence of value of property, if it had been as represented, its value would be considered to be the contract price. We also held in Morrow v. Franklin, 289 Mo. 549, 571, 233 S.W. 224, 230, that the subsequent history of a corporation is admissible to show actual value at the time of purchase, where the stock became worthless during the next year. Therefore, we conclude that the cause should be remanded.

Concerning Instruction No. 6, which was based on Instruction No. 8 in Morrow v. Franklin, 289 Mo. 549, 574, 233 S.W. 224, 232, we have the view that, under the circumstances of this case, the jury should not have been instructed as a matter of law that plaintiff had a right to rely upon defendant's representation. "[T]he right to rely on a representation is generally held to be a question of fact." 24 Am.Jur. 143, Fraud and Deceit, Sec. 296. We consider this as an issue for the jury in this

case because plaintiff was the manager of this business and took almost four months to reach his decision to buy, obtaining advice from his attorney during that time. See Monsanto Chemical Works v. American Zinc Co., Mo.Sup., 253 S.W. 1006; Luikart v. Miller, Mo.Sup., 48 S.W.2d 867, 869; Orlann v. Laederich, 338 Mo. 783, 92 S.W.2d 190, 197; Sheldon v. Brace Motor Co., Mo.App., 210 S.W.2d 110, 113; 37 C.J.S. Fraud, § 129, p. 455; Chase v. Rusk, 90 Mo.App. 25, 30. The specific criticism of this instruction urged here was not made and ruled in the Morrow case and the facts of that case were different concerning the plaintiff's means of knowledge. In his brief, plaintiff claims a confidential relationship as a basis for reliance but that likewise does not appear as a matter of law.

Since this case may be retried, we consider defendant's claim concerning Instruction No. 2, although not properly raised because not mentioned in his motion for new trial, because the same contention continues to be made by others; namely: that the burden of proof in a case of fraudulent misrepresentation tried to a jury must be greater than in other cases tried to a jury. This is not true. See Weston v. American National Assurance Co., Mo.App., 32 S.W. 2d 789, 791; Mueller v. Burchfield, 359 Mo. 876, 224 S.W.2d 87, 13 A.L.R.2d 153; see also discussion in 24 Am.Jur. 118, Fraud and Deceit, Sec. 278. Parties who make this contention cite equity cases, in which such remedy as cancellation is sought, but these have no application to jury cases. For proper burden of proof instruction in future jury cases, see MAI No. 3.01, June 1964 supplement. Our rule is that the burden of proof on fact issues to be decided by a jury does not change with the kind of case to be tried.

The judgment is reversed and the cause remanded.

All concur.