**William T. TIETJENS, Respondent,**

v.

**GENERAL MOTORS CORPORATION, and Marvelle C. Carter, Administratrix of the Estate of Bennett C. Carter, Deceased, Appellants.**

**No. 52555.**

Supreme Court of Missouri,
Division No. 1.

July 10, 1967.

Motion for Rehearing or to Transfer to Court en Banc Denied Sept. 11, 1967.

Morris H. Kross, James W. Benjamin, Rogers, Field & Gentry, Kansas City, for respondent.

John Murphy, Lucian Lane, Clark A. Ridpath, Tucker, Murphy, Wilson, Lane & Kelly, Kansas City, for appellants.

HIGGINS, Commissioner.

Action for damages for fraud resulting in verdict and judgment for plaintiff against both defendants for $15,000 actual damages and against defendant General Motors Corporation for $5,000 punitive damages, a total judgment of $20,000.

In the summer of 1958 plaintiff, William T. Tietjens, in association with his son Terry, was farming and raising cattle on 1,052 acres near Richland, Kansas. Lloyd Craig, while a partner in a Massey Ferguson farm implement dealership in Hiawatha, Kansas, had known Mr. Tietjens for twelve or fourteen years. In the summer of 1958 Mr. Craig was selling farm implements for various dealers on commission and he visited Mr. Tietjens several times. Through him, Mr. Tietjens learned that Frank and Ted J. Kuckelman, owners of Massey Ferguson, Inc., New Holland Machine Company, and Chevrolet Division of General Motors Corporation dealer franchises at Frankfort, Kansas, were interested in selling their business. Mr. Tietjens became interested in purchasing the Kuckelman business and, on September 23, 1958, contracted with them for the purchase of their real estate, building, shop equipment, parts, and fixtures, contingent upon plaintiff's receiving dealer franchises of Chevrolet Motor Division and of the two farm implement companies.

At all times General Motors maintained a zone office in Kansas City, Missouri, for its Chevrolet Division and its area included

the Frankfort, Kansas, dealership. Bennett C. Carter was the zone manager and William L. Woodin was the assistant zone manager. "They were charged with the responsibility of protecting the Company's interest in the retail markets of the area in which they had supervision of new cars, new trucks, parts and accessories." They dealt "with the dealer organization." In the Chevrolet Division echelon there was a regional office, also located in Kansas City, between the zone office and Detroit, Michigan, headquarters. The regional office supervised zone offices in its region. It normally had no contact with retail dealers and, in this case, had no direct contact or correspondence with plaintiff.

On September 29, 1958, plaintiff, his son Terry, and the Kuckelmans were in the Kansas City zone office where they met zone manager Carter and assistant zone manager Woodin. Plaintiff testified that at this meeting Ted Kuckelman told Mr. Carter "he was selling—we had bought his business, subject to the contract, of course." Mr. Carter gave plaintiff an "application for Chevrolet Dealer Selling Agreement" which plaintiff took home, completed, and mailed to the zone office. He understood its provisions, including the recitals that he, as applicant, "ACKNOWLEDGES AND AGREES:

"1. THAT THIS APPLICATION FORM HAS BEEN SUPPLIED TO HIM AS A CONVENIENCE.

"2. THAT RECEIPT OF THIS APPLICATION BY CHEVROLET MOTOR DIVISION SHALL BE WITHOUT OBLIGATION ON ITS PART.

"3. NO ONE OTHER THAN THE GENERAL MANAGER, GENERAL SALES MANAGER OR AN ASSISTANT GENERAL SALES MANAGER OF THE CHEVROLET MOTOR DIVISION HAS THE AUTHORITY TO APPROVE THE UNDERSIGNED'S APPLICATION FOR A CHEVROLET DEALER SELLING AGREEMENT FOR ANY LOCATION; THAT SUCH APPROVAL, IF GIVEN, WILL BE WRITTEN; THAT ANY EXPENDITURES MADE, OR COMMITMENTS ASSUMED BY THE UNDERSIGNED PRIOR TO RECEIPT BY THE UNDERSIGNED OF SUCH WRITTEN APPROVAL SHALL BE THE SOLE RISK AND RESPONSIBILITY OF THE UNDERSIGNED WITHOUT ANY LIABILITY OR OBLIGATION WHATSOEVER ON THE PART OF CHEVROLET MOTOR DIVISION."

On November 3, 1958, plaintiff, Terry, and the Kuckelmans were again in the zone office and the application and plaintiff's plans were discussed. Plaintiff recognized at this meeting that the application had not had sufficient opportunity to get through channels for consideration in Detroit.

On November 19, 1958, these same persons were in the zone office. Plaintiff asked how the franchise was coming along and Mr. Carter said "that he had passed on it and sent it on to his—I just proposed (sic) that it was Detroit—he said it was his superior." Plaintiff knew and understood at this time that before he could get a Chevrolet dealer selling agreement it had to be approved in Detroit and that it had not yet been approved in Detroit. Plaintiff had been approved for the Massey Ferguson and New Holland dealerships prior to this meeting.

It was shown that a zone manager was responsible to the regional manager; that persons seeking dealer selling agreements would file written application with the zone manager. If the zone manager approved, he sent the application to the regional manager. If the regional manager approved, he sent the application to Detroit; if not, the matter ended there.

Mr. Carter prepared a "Chevrolet Dealer Organization Change" December 5, 1958, in which he approved a dealership change from Kuckelmans to Mr. Tietjens. This was mailed to the regional office December 9, 1958. On December 17, 1958, the region-

al manager, A. W. Strang, rejected the proposed change and, by letter received in the zone office December 19, 1958, stated the reasons for rejection and so notified Mr. Carter and the zone office. Mr. Tietjens was not told of this rejection. He learned of the rejection about December 21, 1958, through Frank Kuckelman, who told him he had heard that the change of franchise from Kuckelmans to Mr. Tietjens was not "going through" and would not be approved. Mr. Tietjens then went to the zone office on December 23, 1958, accompanied by Mr. Craig, to confer with Mr. Carter and Mr. Woodin. Mr. Craig related the conversation: "Mr. Tietjens asked Mr. Carter if it was true that they were not going to transfer the Chevrolet franchise to him from Mr. Kuckelman, and he said, 'No, that is not true.' * * * He said, 'No, we told Mr. Kuckelman yesterday that we could not transfer the franchise because he was leaving the business.' That if Mr. Tietjens bought it, that our obligations were to the new man instead of the old man, and that we felt that the price that he had asked for the equipment was too exhorbitant (sic), and that about two-thirds of the stock—parts stock on hand—were obsolete and they didn't feel that they should handicap a new dealer with that much of a handicap, and therefore that they would not transfer the franchise, that they liked to start their dealers out with a new stock of parts * * *, also that they would expect at least thirty-five hundred more square feet of building to be put up, and Mr. Tietjens said, 'Well, why would I want to put up more building if I didn't get a franchise?'—'if I wouldn't get the franchise?' And he said, 'Your new contract is here, but it is contingent that you do put up thirty-five hundred more square feet and that you don't buy the parts from Mr. Kuckelman. You let Mr. Kuckelman return those parts to us, if he will do it, and we will set you up as a new dealer with a new set of parts.' * * * Mr. Carter or Mr. Woodin, * * * one or the other, * * * suggested that we go over to Waterville * * * to look over their building

* * * and that would give us some suggestions as to the proper type of building that they would want at Frankfort, Kansas if we could make the deal with Mr. Kuckelman. So we told him we would do that—or Tietjens did—and that it was fine with him to build the thirty-five hundred more square feet of space, but he said, 'Are you sure that I'll get the franchise if I do?' * * * Mr. Carter assured him that if he could buy the thing satisfactory (sic), and not take the stock parts, and would give assurance that he would put the thirty-five hundred square feet of building up that he would receive a new franchise." Mr. Tietjens' version of the conversation: "I says to Mr. Carter that Frank Kuckelman says that we are not getting the franchise. * * * He (Mr. Carter) says there isn't anything to that. The franchise has been approved and is waiting for our signature * * * for my signature. * * * he said that they thought that the Chevrolet parts stock that the Kuckelmans had was too high, and there was lots of it that would be obsolete, and also the shop equipment, that it was too high and that we should go back to Frankfort and see if we couldn't make a new contract, a new deal with them, whereby we would buy the Chevrolet * * * I mean the building and the Massey Ferguson parts and New Holland parts without the Chevrolet parts * * * that we would need thirty-five hundred feet more of floor space and we would have to give a letter of hold for that, so they would know that—and of course the block man would be around to pick this up."

Tietjens went to the Kuckelmans and negotiated and entered into new contracts of purchase excluding Chevrolet parts and omitting contingency provisions. The contracts were performed by plaintiff; he purchased the land, building, shop equipment, fixtures, and farm machinery parts, and "the first part of the year" he and Terry took possession of the property and the farm implement business.

About January 5, 1959, Mr. Tietjens and Terry met Mr. Woodin in Manhattan, Kan-

sas, and were introduced to a Mr. Tuckfield, a Chevrolet field representative, better known as a "block man." "Mr. Woodin introduced my father as the new dealer at Frankfort, and all that was needed to complete the deal was a letter of intent for some additional floor space * * *. Mr. Woodin told Mr. Tuckfield that they would want to buy back the Kuckelman sign directly from the Kuckelmans, and then resell it to us as the new dealer." Mr. Tietjens never received any written approval of his application for a dealer selling agreement and was never furnished for signature the letter of intent with respect to additional space.

"A couple of weeks" after the Manhattan meeting, "I was down to Massey Ferguson * * * in Kansas City * * * and I called up Mr. Carter's office and Mr. Woodin answered and I asked him—I hadn't heard anything—and I says to him, I hadn't heard anything about how the franchise was coming, and I wonder how—whether it was—write an order so that we could be signed for it, and Mr. Woodin informed me that they wasn't passing on it, that we wasn't to get the franchise. * * * I was so upset over the whole thing that I just hung up."

Honorable Earl Hatcher, Commissioner of the Supreme Court of Kansas, testified that in April 1959, when he was in law practice, Mr. Tietjens came to his office, and he arranged a meeting with Mr. Carter and Mr. Woodin. The meeting was on May 4, 1959, with Hatcher, Tietjens, Carter, and Woodin present. "We discussed several things, but specifically in connection with the contract. I asked him (Mr. Carter) if it were true that he had told Mr. Tietjens that a contract had been prepared and was in the office * * *. He replied that it was * * *. I asked him directly why they did not go through with their contract with Mr. Tietjens * * *. He said that they had adopted a policy by which they were not going to grant any more franchises in a thinly populated area where there was one existing." In respect to the

contract Mr. Carter said "there was papers ready for signature there. They were not signed, as I understand it." Mr. Carter told Mr. Tietjens about the papers at "a conference that preceded the conference which I had, and I think it was just before Christmas (1958)."

Mr. Carter died prior to trial. Mr. Woodin, although a party defendant and present at the trial, did not testify. The suit was dismissed as to Woodin at the close of plaintiff's case.

Appellants contend first that plaintiff failed to make a submissible case of fraud against them.

Instruction No. Two directed a verdict for plaintiff if the jury believed:

"1. Chevrolet Zone Manager Carter was operating within the course and scope of his employment by defendant, General Motors Corporation, when and at the time of representations, if any, made by him to the plaintiff, and

"2. Carter represented to plaintiff that the written Chevrolet dealership, application and contract had been approved by the authorized General Motors official in Detroit and had been returned and was in the Kansas City Zone office, intending that plaintiff rely upon such representations in purchasing the building and property from the Kuckelmans, and

"3. The representations were false, and

"4. Carter knew that they were false, and

"5. The representations were material to the dealership transaction, and

"6. Plaintiff relied on the representations in purchasing the building and property, and in so relying, plaintiff was using ordinary care, and

"7. As a direct result of such representations, the plaintiff was damaged."

■ The jury thus was instructed on all the essential elements of an action for

fraud, Lowther v. Hays, Mo., 225 S.W.2d 708, 713[3], Gockel v. Gockel, Mo., 66 S. W.2d 867, 870[2], Brown, Inc. v. Weber Implement & Auto Co., Mo., 260 S.W.2d 751, 755[3], Hanson v. Acceptance Finance Co., Mo.App., 270 S.W.2d 143, 149[2]; and if all were established, Powers v. Shore, Mo., 248 S.W.2d 1, 5[2], Dolan v. Rabenberg, Mo., 231 S.W.2d 150, 154[3], Lammers v. Greulich, Mo., 262 S.W.2d 861, 864[2], Hanson v. Acceptance Finance Co., supra, 270 S.W.2d l.c. 149[2], by clear and convincing evidence, Bolten v. Colburn, Mo.App., 389 S.W.2d 384, 390[7], Kearns v. Sparks, Mo.App., 260 S.W.2d 353, 359[9], then plaintiff made a case of fraud.

By Instruction No. Three the jury was advised that Carter's "acts were within the scope and course of employment, * * * even though not specifically authorized by" General Motors, if Carter did them "to further the interests of General Motors Corporation under the general authority and direction of General Motors Corporation, and they arose naturally from the performance of (his) work."

The jury could find that Carter's agency, performance of his work, and the course and scope of his employment with General Motors were established by the evidence obtained by interrogatories; that defendant General Motors maintained a zone office at Kansas City, Missouri; that defendant Bennett C. Carter and dismissed defendant William L. Woodin were the manager and assistant manager of the zone office during the times of the transactions involving plaintiff; that the zone office normally handled all matters and contacts with retailers, selling dealerships, and dealership applicants.

In keeping with this situation, plaintiff secured an application for a dealership from Carter and Woodin and filed it with them. The jury could find that plaintiff's purpose at the December 23, 1958, meeting was to determine what had happened to his application in view of the information from his vendor, Kuckelman, that plaintiff was not getting the franchise. The jury also could find that at this meeting with Carter and Woodin it was represented and said to plaintiff, in answer to specific questions, that a franchise had been approved, that he was getting a contract, and that it was in the zone office for his signature, subject only to modification of his contract with Kuckelman and committing additional space. This representation obviously was material to the transaction.

The testimony of Judge Hatcher that Carter said plaintiff was not given the dealership because Chevrolet was not going to grant any more franchises in a thinly populated area where one already existed, and the letter to similar effect from regional manager Strang to the zone office December 17, 1958, furnished evidence to support a jury finding that Carter's representation was false and that Carter knew it was false. Judge Hatcher's testimony also was evidence that Carter was then performing his work and furthering the interest of General Motors by enforcing its policy of granting no more franchises in rural areas such as Frankfort, Kansas, in the same county with Chevrolet dealerships in Marysville and Waterville, Kansas. (No new dealerships have been granted in the county since 1958, and the Frankfort dealership terminated when Kuckelman sold to plaintiff.)

That plaintiff relied on the representations that the franchise had been approved and awarded to him could be found from the evidence that following the December 23, 1958, meeting he renegotiated his contract with Kuckelmans as directed by Carter, omitting the contingencies, and the jury could find further that by reason of such purchase of property intended as a Chevrolet agency which he was never able to use as such plaintiff suffered actual damages. (The $15,000 amount is not questioned.)

Appellants argue in particular that plaintiff failed to establish his right to rely upon Carter's representations in that such right is inseparably connected with the correlative duty to use diligence in respect to

representations made to him. Hanson v. Acceptance Finance Co., supra, 270 S.W.2d l.c. 149[3, 4]. The argument is that with his knowledge of the provisions in capital letters in the dealership application plaintiff knew that Carter had no authority to grant franchises or to bind General Motors by oral statement; that plaintiff knew he could act only when he actually received the Dealer Selling Agreement.

■ Examination of the capital letter provision shows that it was notice to plaintiff of who had to approve an application for a dealer agreement and how it would be approved. Plaintiff, Carter, and Woodin understood who such officials were, that they were located in Detroit, and that such approval would be written. Plaintiff's inquiries of Carter and Woodin, beginning with a November 3, 1958, meeting, related to whether the zone office had sent his application to Detroit and whether it had been approved in Detroit. Plaintiff took no action to carry out his heretofore contingent agreement to purchase from Kuckelmans until he was told on December 23, 1958, by General Motors' agent Carter that his contract was in the zone office ready for plaintiff's signature. Plaintiff's submission is not that he relied on any statement by Carter or Woodin that they had approved the contract or that written approval of the application had been received; he relies only on Carter's statement in Woodin's presence that he was getting a new contract which was now in their office. There was nothing about the capital letter understanding that told plaintiff he could not believe what he was told by General Motors' agent who was in the zone office for the specific purpose of transacting the company's business with retail dealers and prospective dealers. It cannot be read as notice to plaintiff that Carter had no authority to represent to plaintiff that the situation had changed from a proposed transfer from Kuckelmans to plaintiff to one in which not a written approval of an original application but a new franchise contract itself was in the zone office for delivery to plaintiff contingent only upon furnishing a letter of intent to construct additional space and improving his purchase arrangements with Kuckelmans so that he would not be burdened with obsolete parts and overpriced shop equipment. He did thereafter alter his contract with Kuckelmans and was prepared to give the letter of intent to build whenever Field Representative (block man) Tuckfield came to get it. No reason appears why plaintiff should question the truthfulness and veracity of the General Motors agents in dealing with him in a situation where the agents had superior knowledge of the subject matter, and any questions of credibility would be for the jury to resolve.

■ The law on a person's right to rely upon fraudulent statements against a contention of lack of care and diligence is reviewed and stated in Cottrill v. Crum, 100 Mo. 397, 13 S.W. 753, 754–755:

" * * * In other words, the jury were told in this instruction that, although the defendant made false representations as to material, existent facts, calculated to affect the plaintiff's estimate of the value of the property, for the purpose of inducing him to trade therefor, upon which the plaintiff relied, and by which he was induced to make the trade, yet if, by diligent inquiry, he might have discovered that such representations were false, then he could not recover. We do not understand this to be the law. 'It has indeed been laid down as a broad proposition of law that if the means of knowledge be at hand, and equally available to both parties, and the subject of the transaction be open to the inspection of both alike, the injured party must avail himself of such means, if he would be heard to say that he was deceived by the representations of the other party, unless there was a warranty of the facts.' Bigelow, Frauds, 522. This instruction cannot be maintained even upon the broad terms of this proposition; for by it the plaintiff is precluded from recovery if he could have discovered the truth by diligent inquiry, whether the means of knowledge were at hand, or

whether they were equally available to him as to the defendant or not. It may be well, however, to note the continuing remarks of Mr. Bigelow on the general proposition. He says, (page 523 et seq.:) 'But there is serious ground for doubting the correctness of this proposition in its broad form. It will be seen upon reflection that the situation of the person to whom the misrepresentation was made is quite different in regard to means of knowledge from that of the person who made it. The latter may well be held to the duty to know the facts. * * * The former has been put off his guard and misled by the very representation which has been made. Indeed a representation may as well mislead even where the means of knowledge are directly at hand as where they are not. The supposed rule in regard to means of knowledge came to be applied in this country before this distinction had been pointed out. * * * Recent authority has, however, gone far towards setting the matter right in principle. The proposition has now become very widely accepted at law as well as in equity, at least as general doctrine, that a man may act upon a positive representation of fact notwithstanding the fact that the means of knowledge were specially open to him. * * * It may be improbable that a man with the truth in reach should accept a representation made in regard to it, but the improbability can be no more than matter of fact. If the representation were of a character to induce action, and did induce it, that is enough. It matters not, it has well been declared, that a person misled may be said, in some loose sense, to have been negligent; for it is not just that a man who has deceived another should be permitted to say to him, "You ought not to have believed or trusted me," or "You were yourself guilty of negligence." ' After citing many cases illustrative of the principle here stated, the learned author sums up thus, (page 528:) 'The result appears to be, not only in principle, but by the weight of authority, that the party to whom the representation is made is affected by means of knowledge or by notice only where the language or conduct was not of a kind to withdraw his attention from what otherwise he would be bound to know, i.e., only where the representation was not calculated to put him off his guard, as in cases of representations of value or opinion.' To use the language of another author: 'The doctrine of notice has no application where a distinct representation has been made. A man to whom a particular and distinct representation has been made is entitled to rely on the representation, and need not make any further inquiry, although there are circumstances in the case from which an inference inconsistent with the representation might be drawn.' Kerr, Fraud & M. 80. 'No man can complain that another has relied too implicitly on the truth of what he himself stated.' Id. 81. The same general principle has been expressed by this court in the following terms: 'It is no excuse for, nor does it lie in the mouth of the defendant to aver that plaintiff might have discovered the wrong, and prevented its accomplishment, had he exercised watchfulness, because this is but equivalent to saying "You trusted me; therefore I had the right to betray you." ' Pomeroy v. Benton, 57 Mo. 531." See also Cantley v. Plattner, 228 Mo.App. 411, 67 S.W.2d 125, recognizing that ordinarily no relief will be afforded for an alleged fraud where parties stand on equal footing or where the subject matter is equally known to both, which is not the situation between General Motors and its agents on one hand and plaintiff on the other, and, aside from that disparity holding that "such rule has no application where a distinct and specific representation is made to be acted upon or for the purpose of inducing action and which has induced action. * * * 'the general doctrine laid down in the books as elementary is that the doctrine of notice and means of knowledge has no application where distinct and positive representations of fact have been made, have been relied upon and have induced action.' " 67 S.W.2d l.c. 130–131[10–12].

In Wright v. Weaver, Mo.App., 231 S.W. 2d 857, plaintiffs contracted with defendants' agent for purchase of a restaurant "provided the credit of Edith M. Wright is approved." Plaintiffs understood they were to be accepted as tenants by defendants before the contract took effect. Defendants' agent told them that credit had been approved and that they had been accepted as tenants. They made their payment but were not given possession of the premises. The defense was that plaintiffs had no right to rely upon the agent's representations because they had the same opportunity as defendants to determine whether they could obtain occupancy, and that because of their lack of diligence and care they could not claim fraud. Relying upon Cantley v. Plattner, supra, it was held that plaintiffs' right to rely upon the misrepresentation was a jury question. See also Thaler v. Niedermeyer, 185 Mo.App. 257, 170 S.W. 378, where plaintiff was not precluded from relying on defendants' false representation even though warned by his own attorney not to rely upon such representation.

Baker v. Bickel, Mo., 386 S.W.2d 105, 110[7], cites 24 Am.Jur. 143, Fraud and Deceit, § 296: " * * * the right to rely on a representation is generally held to be a question of fact. Even though it lies within the province of the court to state abstractly the right to rely upon a false representation, in a specific case the jury must determine from the facts introduced in evidence whether the party who claims to have been deceived had reason to rely upon the statements made to him. * * * Likewise, questions of fact are whether a party asserting that he has been defrauded by a false representation had knowledge of its falsity and knew the truth or had means of ascertaining it, and should have known it; whether he exercised due care and was justified in placing confidence in the statement; whether he should have made an investigation, or at least have consulted the sources of information to which the other party referred him, or, conversely, whether

a representation had the effect of inducing the person to whom it was made to forgo an investigation * * *."

Appellants argue further from the application's capital letters that plaintiff was "specifically advised of the limits of authority" of the General Motors agents, and that a corporation is not bound by the acts of agents "within some apparent scope of authority, when the person dealing knows that the corporate agent has no such authority." International Harvester Co. of America v. Rieke, 8 Cir., 9 F.2d 776; Knoche v. Pratt, Mo.App., 187 S.W. 578; Wyler Watch Agency v. Hooker, Mo. App., 280 S.W.2d 849; Seibel v. Harry S. Surkamp Inv. Co., Mo.App., 328 S.W.2d 179; Curtiss Candy Co. v. National Finance Corp., 228 Mo.App. 609, 71 S.W.2d 833; Distassio v. American United Life Ins. Co., 238 Mo.App. 279, 179 S.W. 610; Werner v. Welsh Co., Mo.App., 247 S.W.2d 311, and Trice v. Lancaster, Mo.App., 270 S.W.2d 519, cited by appellants, involve actual, implied, or apparent authority of agents in making contracts. They are not in point because plaintiff's theory is that of liability of agent and principal for wrongful or tortious acts while the agent was acting within the general course and scope of his conceded employment and agency. Again, the question is not whether Carter and Woodin could give the September 29, 1958, application for franchise the written approval reserved by the capital letters to certain General Motors officials in Detroit, but is whether Carter and Woodin in the general course and conduct of the zone office of General Motors represented that a dealership contract was in the office awaiting only plaintiff's signature. The distinction between the nonliability of the alleged principal for acts of an agent in the claimed, apparent and restricted agencies in appellants' citations and the liability of a principal for tortious conduct of an agent acting within an existing employment and agency is demonstrable by case law. In Phipps v. Mallory Commission Co., 105 Mo.App. 67, 78 S.W. 1097, plaintiffs sued

for fraud claiming that the principal was liable and responsible for the act of its stated agent as opposed to the principal knowing of or authorizing the fraud practiced on plaintiffs by the agent. "The only proper contest between the parties was whether defendant informed plaintiffs that Walker was its agent in Oklahoma, who would buy, or assist them in buying, the cattle which plaintiffs were seeking. And whether Walker thereafter opened communication with plaintiffs, by informing them that he had found cattle * * * which were what they wanted, and thereafter selling the cattle, or inducing plaintiffs to buy the cattle, in the fraudulent manner above stated. It does not make the slightest difference in defendant's liability that it never authorized its agent to practice the fraud." 78 S.W. l.c. 1098. Darks v. Scudders-Gale Grocer Co., 146 Mo.App. 246, 130 S.W. 430, was a suit for wrongful death based on fraud perpetrated by defendant's agent on plaintiff's decedent. The defense was that the principal was not liable because the agent had no authority to make the representations. The ruling was that "Any fraud perpetrated by the agent on a third party in the course of his employment, and for the benefit of the principal, must be imputed to the principal, whether or not the latter had actual knowledge of it." 130 S.W. l.c. 437.

■ The particular difference between Carter's lack of authority to give written approval of plaintiff's application or to enter into a contract, and the liability for the tortious representation by Carter that a contract of franchise for plaintiff was in Carter's office is stated, Globe Indemnity Co. v. First National Bank in St. Louis, Mo.App., 133 S.W.2d 1066, 1071[3, 4]: "There is a wide distinction to be drawn between the authority of an agent to commit a fraudulent act, and his authority to transact the business in the course of which the fraudulent act is committed. * * * 'Tested by reference to the intention of the principal, neither negligence nor fraud is within the "scope of the agency;" but tested by the connection of the act with the property and business of the agency, fraud in taking the very property is as much "within the scope of the agency" as negligence in allowing others to take it. The proper inquiry is, whether the act was done in the course of the agency and by virtue of the authority as agent. If it was, then the principal is responsible, whether the act was merely negligent or fraudulent.' " See National City Bank of St. Louis v. Carleton Dry Goods Co., 334 Mo. 339, 67 S.W.2d 69, 73, recognizing the soundness of the rule of the foregoing cases.

■ Appellants, of course, interpret the testimony and evidence differently; but respondent is entitled to the most favorable view of the evidence, and under this evidence and these authorities, plaintiff's case was for the jury.

Appellants charge error in admitting, in violation of the Dead Man's Statute, Section 491.010, V.A.M.S., plaintiff's testimony as to statements of Chevrolet Zone Manager Bennett C. Carter to plaintiff, because Mr. Carter was dead at the time of trial. Appellants cite a number of cases which assert generally that where the agent with whom the plaintiff dealt in transactions in issue is dead, the plaintiff may not relate statements of the agent against his principal, but such cases and general rule do not govern this case.

Mr. Carter was an original defendant in this case, but he died prior to trial and his administratrix was substituted as a party defendant. The fraudulent representation attributed to Mr. Carter and relied upon as the basis of plaintiff's action was made on December 23, 1958, when Carter was the agent of General Motors as Kansas City Zone Manager of Chevrolet Division. On that date William L. Woodin, a joint defendant until dismissed at the close of plaintiff's case, was also the agent of General Motors as assistant manager of the Kansas City zone office. Mr. Woodin was present and participating with Mr. Carter at the initial meeting with plaintiff in the zone office September 29, 1958; he was

present at a November 3, 1958, meeting with plaintiff in the zone office and participated in the discussions with plaintiff; he was present and participating with Mr. Carter at the December 23, 1958, meeting in the zone office when the representations were made by Carter to plaintiff out of which this action arose; he arranged for the January 5, 1959, meeting in Manhattan, Kansas, and he attended that meeting, introducing plaintiff to field manager Tuckfield as the new dealer in Frankfort, Kansas, instructing plaintiff not to buy Kuckelman's sign, and advising him that Tuckfield would be in Frankfort soon to get the letter of intent on building additional space.

Under these circumstances Woodin and Carter were joint agents in all transactions with plaintiff in the course of their employment and the Dead Man's Statute does not apply. "The object of the statute is to guard against false testimony by the survivor, and, in order to do this, it establishes a rule of mutuality, by which, when the lips of one contracting party are closed by death, the lips of the other party are closed by law. And this principle remains unaltered, as well where the contracting agent of a corporation dies, as where the contracting agent of a firm dies; and the dangers and the mischiefs of any other rule would be as great in the former as in the latter case. A corporation can only speak and act through agents. The agent represents the corporation, and if, after the death of an agent of a corporation, it were admissible for a party to come in and testify to a contract made with such agent, * * * it is easy to see that corporations would be without protection * * *," Williams v. Edwards, 94 Mo. 447, 7 S.W. 429, 431; but the situation is different where one deals concurrently with two agents, one of whom is alive at the trial, Meyer v. Dubinsky Realty Co., Mo.App., 133 S.W.2d 1106, 1110[7, 8]: "Passing to the admission of evidence, defendant contends that the court committed error in admitting evidence as to conversa-

tions and transactions had between plaintiff and Grossman, who was dead at the time of the trial. We appreciate the general rule, as also does plaintiff, that one who contracts with the authorized agent of a corporation (as Grossman admittedly was in his relation to defendant) is not a competent witness as to such contract, or as to the admissions and declarations of the agent after the agent's death. Such rule, however, has no application to the situation presented by this record, since Stewart, defendant's other contracting agent, was alive at the time of the trial, and would have been competent to testify if he had been called as a witness. Under such circumstances, the reason for the disqualification of plaintiff as a witness did not exist, and the court acted properly in overruling the objection to her testimony." The rule has the same application with respect to the admission of plaintiff's testimony against the administratrix. Williams v. Perkins, 83 Mo. 379, 385; Fulkerson v. Thornton, 68 Mo. 468. See also Birdsall v. Coon, 157 Mo.App. 439, 139 S.W. 243, 246 [2]; McConnon & Co. v. Kuhlmann, 220 Mo.App. 821, 278 S.W. 822, 824[3]; and for distinction where the survivor took no part in the transaction with the dead adverse party, see Bussen v. Del Commune, 239 Mo.App. 859, 199 S.W.2d 13, 19–20[8, 9]; Slagle v. Callaway, 333 Mo. 1055, 64 S.W.2d 923, 90 A.L.R. 1366. Under the law and circumstances here plaintiff was a competent witness against appellants because the deceased agent's joint agent Woodin was advised of the entire transaction and was alive and present at the trial and, although not called, was available to contradict, explain, or rebut plaintiff's version of the transaction. The reason for disqualification of plaintiff as a witness did not exist and no error was committed in receiving his testimony.

Error is charged against defining "ordinary care" as "that degree of care that the plaintiff would reasonably use under his situation and circumstances."

The gist of appellants' argument is that this definition provides "actually no stand-

ard of care," or permits the measure of precaution "that plaintiff himself believes and thinks is reasonable" to serve as a standard of ordinary care.

Admittedly MAI 11.05 defining ordinary care does not provide a definition applicable to a fraud case thus requiring a modification for this case.

The rule with respect to care in a fraud case is stated in State ex rel. Union Pac. R. Co. v. Bland, 324 Mo. 601, 23 S.W.2d 1029, 1032: "The real and ultimate question in such instances is whether the fraudulent acts and statements were of such nature that the other party had a right to rely on them. If they were, there was no negligence; if not, there was no actionable fraud. Hence it is misleading to say the evidence must show fraud *plus* absence of negligence. Or, putting it another way, some of the authorities say the fraud is actionable when it induces the negligence. 13 C.J. § 250, p. 372; Laird v. Keithley (Mo. Sup.Div. 1) 201 S.W. 1138, 1142. But it is a misnomer to use the word 'negligence' at all in the above connection if it is to be understood as carrying its usual signification—failure to use the degree of care which an ordinarily prudent person would exercise in the same or similar circumstances, 45 C.J. § 52, p. 683, § 74, p. 699; Jablonowski v. Modern Cap. Mfg. Co., 312 Mo. 173, 186, 279 S.W. 89, 92. For the law of fraud does not exact of the victim that degree of caution which some other hypothetically prudent person would have used, but only reasonable care in view of *his* situation." See also Bertram v. Kempster, Mo., 216 S.W.2d 494, 496 [5]; Wood v. Robertson, 245 S.W.2d 80, 84 [3]; Hanson v. Acceptance Finance Co., supra, 270 S.W.2d l.c. 149; Orlann v. Laederich, 338 Mo. 783, 92 S.W.2d 190, 194 [6] (burden on plaintiff to show his reliance "was an act of ordinary prudence").

■ Appellants suggest that the definition should have been "that degree of care that would be reasonable in view of plaintiff's situation," and such a definition would be preferable, but the definition given was sufficiently accurate as to avoid misdirection and negate the strained construction placed upon it by appellants. Fields v. Missouri Power & Light Co., Mo., 374 S.W.2d 17, discussed a definition of ordinary care attacked in a negligence case as being inaccurate and, appropriate to this case, concluded "that the definition of the term 'ordinary care' * * * was not erroneous, and it did not constitute a misdirection to the jury. What plaintiff contends should have been in the instruction is no more than another way of saying the same thing, but in a way more favorable to plaintiff. No clarifying or amplifying instruction was requested by plaintiff and the trial court cannot be charged with error in giving the instruction it did in the absence of such a request." 374 S.W.2d l.c. 25[5]. "This court has repeatedly said that when an instruction is not erroneous but does not present an issue as clearly or succinctly as a party thinks it should, he must call the matter to the attention of the trial judge by requesting a clarifying or amplifying instruction. * * * The time to obtain a better worded instruction is at the time of the trial * * *." 374 S.W.2d l.c. 33–34[21]. See also Lewis v. Zagata, 350 Mo. 446, 166 S.W.2d 541, 545[5], "The test of the correctness of an instruction is how the instruction will naturally be understood by the average men who compose our juries * * *"; and Gould v. M.F.A. Mutual Ins. Co., Mo.App., 331 S.W.2d 663, 671 [15, 16], "* * * in determining the legal sufficiency of an instruction, we should not be hypertechnical in requiring grammatical perfection, the use of certain words or phrases, or any particular arrangement or form of language, but that we rather should be concerned with the meaning of the instruction * * * to a jury of ordinarily intelligent laymen * * *."

■ Examined by these principles, the definition did not assume nor direct the jury that the ordinary care required of plaintiff was what he thought was reasonable under the circumstances. While the

instruction could have been improved, the defect argued here simply is not a matter which "materially affects the merits of the action," Civil Rule 83.13(b), V.A.M.R., as to require reversal. Williams v. Kaestner, Mo.App., 332 S.W.2d 21, 29–30[10].

Instruction No. Four on measure of damages and No. Eleven on forms of verdict each required assessment of damages against both defendants if the issues were found for plaintiff. Appellants charge this to be an erroneous submission, arguing that "defendant Carter could be liable for actual damages alone, on the basis that the claimed representations, not being authorized by defendant General Motors, were not binding upon the corporate defendant."

■ Appellants recognize that "[t]he principal must respond for any fraud that an agent perpetrates while he is about his master's business within the scope of his authority", National City Bank v. Carleton, supra, 67 S.W.2d l.c. 73[8], and that is the previously demonstrated theory of plaintiff's action as submitted by Instruction No. Two. The same contention was ruled in Dettler v. Santa Cruz, Mo.App., 403 S.W.2d 651, where, as here, plaintiff sued both agent and principal for damages for fraudulent representation. Submission to the jury was by an instruction similar to No. Two here and the submission also required assessment of actual damages against all defendants and did not provide forms for separate verdicts against all defendants. "There is one further matter that, since it is most likely to arise again upon retrial, should be disposed of. The defendants attack the giving of Instruction No. 9, MAI 32.11, on the ground that the verdict forms therein provided prevented the jury from rendering a verdict for the plaintiff and against any number less than all of the defendants. It is urged that MAI 32.05, modified to provide for four parties, should have been given. However, it should be noted there is no contention here raised that there is any error due to the fact that regardless of their joint liability for actual damages punitive damages might not be awarded against one or more defendants.

"Under the particular factual situation here presented we find no error in the giving of Instruction No. 9. It will be recalled that the first paragraph of plaintiff's verdict-directing instruction required the jury to find as true the plaintiff's theory that Santa Cruz was acting as the agent of the other defendants in conducting the negotiations with the plaintiff regarding the sale of this building. Read together the first and second paragraphs of Instruction No. 3 required the jury to find that Santa Cruz was acting as agent for the other defendants at the time the misrepresentation was made. In view of the plaintiff's theory as to Santa Cruz's agency and the uncontradicted evidence to support it, the giving of this instruction precluding the jury from finding against less than all of the defendants was not error." 403 S.W.2d l.c. 657.

Instruction Number Five authorized an award of punitive damages against General Motors if the jury found that the agent's conduct as submitted in Instruction Number Two was wilfully wanton or malicious. Appellants assert that punitive damages are not recoverable against the estate of the decedent, and since Carter was dead and could not respond in punitive damages, this precluded an award of punitive damages against General Motors and error is charged, therefore, in submitting an issue of punitive damages to the jury.

Although not ruled in Missouri, it appears from the law of other jurisdictions that where a wrongdoer has died before trial, punitive damages cannot be awarded against his estate. See for example, Evans v. Gibson, 220 Cal. 476, 31 P.2d 389; Morriss v. Barton, 200 Okl. 4, 190 P.2d 451; Hayes v. Gill, 216 Tenn. 39, 390 S.W.2d 213; Sears, Roebuck & Co. v. Jones, Tex. Civ.App., 303 S.W.2d 432; Dalton v. Johnson, 204 Va. 102, 129 S.E.2d 647; Amos v. Prom, Inc., N.D.Iowa, 115 F.Supp. 127; and, consistent with such authorities, the is-

sue of punitive damages originally pleaded against defendant Carter was withdrawn from the case by Instruction Number Eight.

█ "We have consistently sustained the award of punitive damages against a corporate defendant (private corporation) for the wrongful act of its servant or agent in the course or line of his employment when the evidence shows such wrongful act was done wilfully, wantonly or maliciously." State ex rel. United Factories, Inc. v. Hostetter, 344 Mo. 386, 126 S.W.2d 1173, 1175[3]. And numerous cases show that it is not necessary to sue the agent and principal and recover punitive damages against the agent in order to sustain an award of punitive damages against the corporate principal. For recent example, see Beggs v. Universal C.I.T. Credit Corp., Mo., 409 S.W.2d 719, and see also similar actions in 10 Mo.Dig. p. 115, Damages █ and 8 Mo.Dig. p. 289, Corporations █ Appellants appear to argue without authority that punitive damages can be awarded against a corporate principal only where they are awarded against the agent but, contrary to this argument, the conditions necessary to an award of punitive damages are simply an award of actual damages against a party, Adelstein v. Jefferson Bank & Trust Co., Mo., 377 S.W.2d 247, 252[4], and the further finding that the actual damages were occasioned by wilful, wanton or malicious conduct.

The precise point was decided in Ford Motor Credit Co. v. Hill, W.D.Mo., 245 F.Supp. 796, where plaintiff pleaded for actual and punitive damages against the defendant bank while admitting that it could not recover punitive damages from the estate of Lester Cox, defendant's deceased joint tortfeasor. The court reasoned from Thomson v. Catalina, 205 Cal. 402, 271 P. 198, 62 A.L.R. 235, relied on in State ex rel.

Hall v. Cook, Mo., 400 S.W.2d 39, to hold that even though the estate of Lester Cox could not be held liable for punitive damages, the jury would be permitted to make awards of punitive damages against other joined defendants who might be liable under the evidence for such damages, and that the issue of punitive damages would be submitted against all defendants except the estate of Lester Cox.

█ Finally, appellants complain of the definition of "agency" in Instruction Number Three, arguing that it did not fit the case or issue and that offered Instructions A and C should have been given.

Instruction Number Three was MAI 13.02. Although designed for use in a case of battery by an agent, it is equally the proper instruction for use in a case involving other wrongful or tortious conduct of an agent, and whenever MAI contains an instruction applicable to a particular case, "such instruction shall be given to the exclusion of any other on the same subject." Civil Rule 70.01(b). Examination of offered Instructions A and C shows them not to be definitions of "agency" appropriate to this case; at most, they are converse or cautionary instructions.

Judgment affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

HENLEY, P. J., and SEILER and HOLMAN, JJ., concur.

STORCKMAN, J., not sitting when cause was submitted.