S. L. Cantley, Commissioner of Finance in Charge of North Missouri Trust Company, Appellant, v. Harry Plattner et al., Respondents.—67 S. W. (2d) 125.

Kansas City Court of Appeals. January 8, 1934.

*Gilbert Lamb* and *Fry, Hollingsworth & Francis* for appellant.

*George P. Adams, Rodgers & Buffington* and *Roy McKittrick* for respondents.

REYNOLDS, C.—This is an action in behalf of the above named, closed bank, the North Missouri Trust Company, a corporation, by the State Finance Commissioner on defendants' promissory note for $6400 dated March 21, 1930, payable to the order of the North Missouri Trust Company, which, as indicated, is now closed and in the hands of the said commissioner for the purpose of liquidation. Defendants are husband and wife. Said note bears seven per cent compound interest per annum from date and was made payable at the office of the said trust company, the payee, in Mexico, Audrain County, Missouri. The note sued on is the renewal of a former note for the same amount dated July 24, 1929, which defendants, on that date, executed and delivered to the said North Missouri Trust Company in

payment for sixty-four shares of stock in the W. H. Scott Abstract Company held by the trust company.

The suit was filed in the Circuit Court of Chariton County at Keytesville; and, by agreement, the venue was later changed to the Circuit Court at Salisbury.

In their first amended answer filed November 19, 1931, defendants admit the right of the State Commissioner to have charge of said trust company's affairs and to sue on the note in question, he being now engaged in the process of liquidating the business of said trust company as a banking corporation. The amended answer also admitted the execution of the note in suit and alleged that it was a renewal of the former note of July 24, 1929, and further set up the following:

That the W. H. Scott Abstract Company was incorporated in February, 1924, with one hundred shares of capital stock of the par value of one hundred dollars per share, all of which were issued to and owned by the stockholders of said abstract company except nine shares and the North Missouri Trust Company owned fifty-five shares of said stock from the abstract company's organization to the time the said trust company sold said fifty-five shares together with the nine shares, making sixty-four in all, to the defendants; that, for many years prior to the incorporation of said abstract company and down to May, 1930, Mr. Walker Pollock was president of the said trust company and, from the date of the incorporation and organization of the abstract company down to said May 1, 1930, Pollock was also a stockholder in and secretary-treasurer of said abstract company; that he was the prime mover in its organization and in the sale of stock in said abstract company; that he secured the housing of the property and office of said abstract company in the banking building of said trust company in Mexico, Missouri, and, as an office in each of said companies, "was during all that time, thoroughly familiar with the character and extent of business which said abstract company had done from its incorporation to August 1, 1929, and said Pollock so told the defendants at the time said Pollock was negotiating with them for the sale of said stock of said Abstract Company;"

That, during all this time, R. M. White was a stockholder and director in the said trust company and also president of the Mexico Savings Bank, another bank in Mexico, and was solvent and financially able to buy the stock in the abstract company at the price at which Pollock was trying to negotiate a sale of it to defendants, all of which Pollock told them at the time;

That for many years, continuously and prior to August, 1924, defendants well knew and were intimately acquainted with Pollock, had often done business with him and, during all that time, a strong and intimate friendship and relationship of trust and confidence had existed between defendants and Pollock and they had implicit con-

fidence in his honesty, fairness, truthfulness, and judgment, not only in all matters of business but especially in all business dealings and transactions between them, and implicit confidence in him that he would not knowingly misrepresent any fact or deceive or attempt to deceive defendants in any trade or deal. in which they were interested;

That in the spring of 1929, at Pollock's request, they met him a number of times, he acting for and within the scope of his authority from the trust company, at which meetings he proposed and endeavored to sell to defendants the said sixty-four shares of the capital stock in said abstract company for one hundred dollars per share and told defendants of the said capital stock, its par value, and that the trust company had purchased and was then the owner of fifty-five shares of said stock which it had authorized him to sell and falsely and fraudulently stated to defendants that he had sought them out for the purpose of giving them—because they were his friends —an opportunity to buy, as the shares of stock at that price were a bargain and he wanted to help defendants in that way; that said Pollock, in order to sell said fifty-five shares and the said nine shares, falsely, knowingly, and fraudulently, with the intent, purpose, and design of deceiving defendants and fraudulently inducing defendants to purchase said shares, made to defendants and to each of them the following false and fraudulent statements, to-wit:

1—That said abstract company was then, and ever since its organization had been, doing a large, prosperous, and profitable business;

2—That said abstract company, ever since its organization, had been making good money and that its stock at one hundred dollars per share was then a profitable and safe investment;

3—That the value of said stock was then one hundred dollars per share and was worth that figure;

4—That said R. M. White was, and for some time past had been, wanting to buy said abstract company stock at one hundred dollars per share but that he, Pollock, did not want to sell it to White because the latter would remove the abstract company's office to his bank building and have its business conducted there; that White was, at the time, away from town but would be back in a few days and would buy said stock when he returned if it had not been sold before and, if defendants wanted to buy it, they would have to act before White returned and would make a great mistake if they did not for he, Pollock, knew the abstract company's business had been, and then was, profitable and would continue to be so;

5—That said Pollock requested and cautioned defendants not to inquire of any one but himself about the stock or let it be known that they were contemplating buying it and especially not to let W. H. Scott, manager of the abstract company, know of their contemplating

the purchase of it for the reason that White would hear of it and immediately buy the stock at one hundred dollars per share for cash, thereby preventing defendants from buying it;

6—That, if defendants would buy fifty-five shares of the stock at one hundred dollars per share, he would buy, at the same price per share, the nine shares which he said were treasury stock; but, after they had agreed to buy fifty-five shares, Pollock falsely and fraudulently told defendant Harry Plattner it did not suit him then to pay for the nine shares but, if they would permit the same nine shares to be issue to them and include the price in their promissory note, he would shortly pay for the nine shares and they could have the nine hundred dollars paid by him therefor credited on their sixty-four hundred dollar note; and, relying on him, they did this; but, when asked afterwards to pay for said nine shares, Pollock refused; and they say that the fact is, as now discovered, that Pollock never did intend to purchase said nine shares;

7—That Pollock falsely and fraudulently represented that the abstract property actually cost twelve thousand dollars, being two thousand dollars more than the sum for which it was incorporated; but that said amount was borrowed and the same had since been practically paid out of the earnings of the business.

Defendants then alleged that each and every one of said statements and representations was false, fraudulent, and untrue, was known by Pollock to be false, fraudulent, and untrue, and was made with the fraudulent intent, purpose, and design to make defendants believe them and act upon them, which they did; that, relying upon said statements, defendants purchased said stock and gave the original note for sixty-four hundred dollars, of which the note sued on is a renewal; that, upon the refusal of said defendants to pay said last named note, the said Finance Commissioner had said stock sold at public auction to the highest bidder and it brought five dollars per share which, after expenses of sale were paid, were credited on said note, which was, and is, in excess of the value of said stock; that, in view of the facts and fraud herein set forth, plaintiff should not recover anything on the note. Wherefore, the defendants ask to be discharged with their costs.

The reply denied all fraud and set up that, immediately upon the purchase of said stock, the defendants became actively engaged in the affairs of said abstract company; that defendant Harry Plattner was elected secretary-treasurer thereof and received a salary therefor of thirty dollars per week and continued to receive same and to act as such officer past the date of the institution of this suit (December 8, 1930), down to some time in the year 1931; that, during all these times, said defendants were both thoroughly conversant with the business of the abstract company and fully cognizant of all the conditions and affairs of same, yet, nevertheless, they, and

each of them, continued to act under said contract of purchase and to accept the benefits thereof and to manage and control the business and affairs of said abstract company; that, when demands were many times made upon them to pay their said note, they promised from time to time to pay same as soon as they could obtain a loan on some land they owned; that they thereupon induced the said trust company to expend time, money, and effort in assisting defendants to get said loan; that they continued to represent to said trust company that they would soon be in a position to pay said note; that, about March 21, 1930, they sought and obtained a renewal of said note and an extension of time for the payment thereof at a reduced rate of interest; that, during all of said time, from the purchase of said stock up until some time in the year 1931 and after the institution of this suit and while seeking said extensions of time, defendants made no protest or claim whatever of misrepresentation or fraud now alleged in said amended answer; and that, even on December ——, 1931, when, in accordance with the terms of said note, plaintiff advertised said stock for sale for the purpose of applying the proceeds to the payment thereof, defendants protested against said action, reaffirmed their purpose to pay said note, and asked for further time to pay same, to which plaintiff acceded until February 19, 1931, when, as defendants were still in default, he proceeded to sell said stock at public auction after publication of due notice and, at said sale, received the net sum of two hundred forty-one dollars and fifteen cents, which was acknowledged as a credit on said note. Wherefore, defendants are estopped from setting up any of the matters they have alleged in their said amended answer.

The jury returned a verdict for the defendants.

Judgment being rendered upon the verdict of the jury for the defendants, the plaintiff, after an unsuccessful motion for a new trial, prosecutes this appeal.

OPINION.

1—Appellant first makes the point that the renewal of the note given for the purchase of the stock here in question and the payment of interest thereon, the repeated verbal promises to pay the renewal note in suit, the request for extensions of time for its payment, the demand that the sale of the stock held as collateral security for the payment of the note be deferred and the trust company's compliance with such demand, all of which occurred after knowledge on the part of the defendants of any fraud practiced upon them, constituted a waiver and an estoppel to set up the fraud as a defense herein and entitled plaintiff to a directed verdict and that the court, therefore, erred in refusing his requested instruction A, offered at the close of defendants' evidence, and likewise erred in refusing his requested instruction B, offered at the close of all the evidence, both

of which directed the jury to return a verdict for the plaintiff for the amount due on the note.

2—The point thus made by appellant necessarily presupposes and concedes the fraud practiced upon the defendants and is based upon the further promise that, notwithstanding such fraud, the defendants' conduct with relation thereto was such as to amount to a waiver thereof and, as a matter of law, to estop them from setting it up as a defense to the action herein and that such conduct was concededly admitted or conclusively established upon the trial to have been as hypothecated in said point and, by reason of all which, plaintiff was entitled to a directed verdict.

3—In a consideration of the point thus advanced, it becomes necessary to determine whether or not the facts are as hypothecated and, if so, whether they are sufficient as a matter of law to raise an estoppel against the defendants. It must be conceded that, if defendants with full knowledge of such fraud made payments upon the original note of interest or principal or if they renewed the same by the execution of the note in suit with such knowledge or under circumstances evidencing an intention to affirm the note in suit and waive the fraud, sought and obtained extensions of time within which to pay, or made oral promises to pay the same, they will be held to have waived such fraud and to be estopped to assert and rely upon it as a defense. In the case of Brown v. Lead & Zinc Mining Co., 231 Mo. 166, l. c. 172 and 173, it was said:

"In cases of fraud and deceit the party has two remedies. First, he may rescind the contract, or, secondly, he may fully perform the contract, and sue for damages resulting from the fraud and deceit. Nor does it appear that there can be a waiver of damages for fraud and deceit, so long as the party adheres to the original contract. He is not compelled to abandon his original contract upon the discovery of fraud but may go on in the fulfillment thereof and rely upon his action for fraud and deceit—

"But whilst this is true, yet when a party entitled to recover for fraud and deceit has knowledge of the fraud and deceit in the original contract and thereafter makes a new agreement, the case law seems to preclude a recovery for the fraud and deceit tincturing the original contract.

"In 14 Am. and Eng. Ency. Law (2 Ed.) p. 171, this idea of an exception is thus expressed: 'The rule that the affirmance of a contract with knowledge of the fraud does not bar an action for damages is subject to the limitation that the party defrauded must stand toward the other party at arm's length, must comply with the terms of the contract on his part, must not ask for favors of the other party or offer to perform the contract on conditions which he has no right to exact, and must not make any new agreement or engagements respecting it. If he does so, he waives the fraud.'

"In 1 Page on Contracts, sec. 139, it is said: 'Since fraud in the inducement makes a contract voidable,—the party defrauded may make the contract valid by electing, with full knowledge of the facts, to treat it as valid. Thus, a promise to pay the purchase money, making a partial payment thereon, the obtaining of an extension of time, renewing a note, or making payments thereon, making a new contract—are all acts which amount to a ratification if done after discovery of the fraud and with full knowledge thereof.' "

In 1 Daniels on Negotiable Instruments (6 Ed.), article 205, it is said, "If the consideration of the original bill or note be illegal, a renewal of it will be open to the same objection and defense—. And if the original instrument was obtained by fraud, a renewal of it by the original parties without knowledge of the fraud, would stand upon the same footing, but if at the time the renewal was executed the parties signing it knew of the fraud in the original or of the failure of consideration, they will be regarded as purging the contract of the fraud and of the defense of failure of consideration, and cannot then plead it."

A renewal note is a new contract. [Seimans & Halske Electric Company v. Ten Broek, 97 Mo. App. 1. c. 175 to 176.]

It, therefore, appears that, if defendants with full knowledge of the fraud inducing the original note renewed the same by the execution of the note in suit as hypothecated in plaintiff's point or made payments of interest on said note with such knowledge, plaintiff's point is good.

4—What is said above equally applies if defendants with full knowledge of the fraud sought and requested extensions of time within which to pay the note in suit or made verbal promises to pay the same.

5—The mere fact, however, that defendants requested that a sale of the stock pledged as collateral security for the payment of the note in suit be deferred and that such request was granted did not in itself amount to a ratification of the fraud in the inducement to the execution of the note or a waiver of their right to damages on account thereof or of their right to assert the same as a defense when sued upon the note even though done with a knowledge of such fraud unless they intended thereby to ratify said fraud and waive it and pay said note regardless thereof; and whether they did so intend at least became a question under all the circumstances for the jury. [Cottrill v. Krum, 100 Mo. 397, 1. c. 405-406.] The defendants had the right to protect the stock for their own or even for plaintiff's benefit without being penalized for so doing. [Authorities supra.] This latter question of defendants' request that a sale of the stock pledged for collateral security be deferred and that such request was granted may be eliminated from further consideration for, as found, it may not in any event be considered as sufficient to have

made the trial court's refusal of defendants' instructions for a directed verdict erroneous.

6—But is plaintiff's contention that defendants' conduct with relation to the fraud was admitted upon the trial to have been as. hypothecated supported by the record? We do not think it is. That the note in suit of date March 21, 1930, is a renewal of the original note the execution of which was induced by the fraud is admitted by the defendants; but that they had any knowledge of such fraud at the time of such renewal is denied by them.

That at the time of the renewal the defendants paid the interest on the original note is admitted but that they had any knowledge of the fraud at that time is denied. The question of knowledge is an essential element of conduct required to waive the fraud; and, therefore, whether or not defendants had knowledge of such fraud at the time of such payment of interest or the execution of the renewal note becomes a question for the jury, unless the appellant's further point to the effect that respondent Harry Plattner was chargeable with knowledge of such fraud at such times and, through him as her agent, the defendant Melissa Plattner was likewise charged, by reason of his position as secretary-treasurer of the abstract company for eight months prior to the execution of said note and the payment of such interest and in control of its books and finances, was good. Whether he was such agent was in itself a question for the jury.

7—Assuming that such records did show the true financial condition of the abstract company on the twenty-fourth day of July, 1929, at the time of the purchase by the defendants of the stock in said company and the execution of the original note, yet the defendants were not required to investigate such records to ascertain such financial condition and the consequent value of the stock if, at such times, particular and distinct representations as to the financial condition of the company and the value of its stock were made by plaintiff or his agents and acted upon by defendants. [Union National Bank v. Hunt, 76 Mo. 439; Cottrill v. Krum, 100 Mo. l. c. 404; Judd v. Walker, 215 Mo. l. c. 328; Kerr on Fraud and Mistake pp. 80-81; Conroy's, Inc., v. Ratz, 14 S. W. (2d) 465.] If such representations were made, the defendants had the right to rely and act upon the same. They were of such character as to induce action and did induce action. [Same authorities.] Whether such representations were made to and acted upon by defendants was a question under the evidence for the jury. If the plaintiff trust company through its agents made such representations, it does not lie in its mouth, after the same have been relied and acted upon, to claim that the defendants by investigation might have discovered the falsity of the same and have avoided them. [Same authorities, supra.] Neither does it lie in the mouth of the plaintiff commissioner so to claim. He stands simply in the shoes of the bank, to the rights of

which he has succeeded and by the limitations upon which he is bound. Ordinarily, it is true that neither law nor equity will afford relief for false representations where the parties stand upon an equal footing or where the subject-matter in dispute is equally known to both; and, if one trusts to representations not calculated to impress a person of ordinary prudence or neglects means of information within easy reach, he should suffer the consequences. [McCaw v. O'Malley, 249 S. W. l. c. 44.] But such rule has no application where a distinct and specific representation is made to be acted upon or for the purpose of inducing action and which has induced action. [Same authorities, supra.] In the case of Judd v. Walker, supra, the court said, "We might add here that the general doctrine laid down in the books as elementary is that the doctrine of notice and means of knowledge has no application where distinct and particular representations of fact have been made, have been relied upon, and have induced action."

8—If the defendants had the right to rely upon such representations and were, therefore, under no duty to seek other sources of information and to make investigation of the records in the first instance, clearly, they had the right to continue to rely upon such representations after entering into said contract and were under no duty to investigate the books or seek out other sources of information later or at the time of the payment of interest or the execution of the renewal note in suit in the absence of actual or other notice of the fraud at such time sufficient to put them on inquiry. [Same authorities, supra.] Under such circumstances, defendants had the right to continue to rely upon the representations as made. Here, therefore, was another question for the jury. A representation may as well mislead even where the means of knowledge are directly at hand as where they are not; and that one may act upon positive representations of fact notwithstanding the fact that the means of knowledge are open to him, if the representation is of such character as to induce and does induce action, seems to be well settled law. [Conroy's, Inc., v. Ratz, 14 S. W. (2d) 465.] Under such circumstances, one later may not shield his fraud behind the alleged negligence of the other, where such negligence, if any, was caused by his misconduct as there was evidence in this case tending to show. [Conroy's, Inc., v. Ratz, supra.]

9—The defendants, in any event, were not required to use extraordinary diligence, which an examination of the books, if required of them, would have been. [Snider v. McAttee, 165 Mo. App. 260.]

10—Corpus Juris, Volume 26, page 1144, under the head of "Fraud and Deceit" makes this statement:

"The tendency of modern decisions is not to extend but to restrict the rule requiring diligence, and similar rules, such as *caveat emptor* and the rule granting immunity for dealer's talk, and to condemn the

falsehood of the fraud feasor rather than the credulity of his victim.'' [Monsento Chemical Works v. American Zinc, Lead & Smelting Company, 253 S. W. (2d) 1006.]

Besides, there is substantial evidence tending to show that the defendant Harry Plattner, as secretary-treasurer of the abstract company, had nothing in general to do with the books and records of the company. He merely had access to the same as any other stockholder. There was substantial evidence tending to show that, as secretary-treasurer of the company, his business was to solicit for the company and to look after the building and loan and insurance business in which it was engaged. There was evidence that one W. H. Scott, the founder of the abstract company, was in charge of the books and records of the company from its organization and was its acting president, looking after all the abstract work and the detail work of the company in general. If such was true, there was not in any event any duty upon the part of the defendant Harry Plattner, even though an officer of the company, to investigate the records or to acquaint himself with what they showed with reference to its financial conditions and business done. So far as pertinent to this controversy, these were all questions of fact for the jury. Notice was not, therefore, as a matter of law, to be imputed to defendant Harry Plattner and, through him as her agent, to defendant Melissa Plattner, from his mere connection with the abstract company at and previous to the date of the renewal note in suit or the payment of the interest upon the original note and his access to the books of the company.

11—Neither were the defendants shown to have had any actual knowledge of the fraud practiced upon them at the time of the execution of the renewal note in suit or the payment of the interest upon the original note on March 21, 1930. It is insisted, however, by appellant that such knowledge was shown by the admissions of the defendants upon the trial. An examination of the record herein fails to disclose any such admissions of knowledge from the books or otherwise at such date. The only admissions are as to knowledge later ascertained, about the latter part of May, 1930, or the first of June, 1930, and that from an examination of the books. The entire question of knowledge, therefore, became one for the jury under the evidence.

12—Further, that defendants sought or obtained extensions of time for the payment of the renewal note in suit or made promises of payment is denied by defendants throughout, whether prior to, at the time of, or subsequent to acquiring knowledge of the fraud. So, such questions were questions of fact for the jury.

It follows, therefore, that the trial court did not commit error in refusing plaintiff's request for instructions A and B for a directed verdict in his favor.

13—Appellant next assigns as error the giving of instruction number 1 by the court below upon the trial, contending that it was an instruction purporting to cover the entire case, directing a verdict, from which consideration of appellant's defense of waiver and estoppel was omitted.

It is true that an instruction purporting to cover the entire case, directing a verdict, requiring an affirmative finding of facts therefor is erroneous if it omits therefrom a pleaded defense of the adverse party, of which there is evidence but not reversibly so, if such matter is presented in an instruction given in behalf of the adverse party. [State ex rel. Ins. Co. v. Cox, 307 Mo. 194.]

In this case, if instruction number 1 for defendants purports to cover the entire case or direct a verdict which, it is not considered by us, it does, it nevertheless requires the jury to find that the defendants executed the renewal note sued upon without any knowledge of the falsity, if any, of the representations made inducing its execution and the execution of the original before finding for plaintiff for a greater sum than the actual value, if any, of the shares of said stock at the time defendants purchased the same, thus including the theory of plaintiff's defense. Before plaintiff's theory of waiver and estoppel could prevail, the acts relied upon to constitute waiver and a consequent estoppel must have been done by defendants after they had acquired knowledge of the fraud and the falsity of the representations. If defendants had no knowledge of such at the time of the doing of the acts relied upon by plaintiff as a waiver and for estoppel, if they did them, there could be no waiver or estoppel as claimed; and, hence, the instruction requiring the jury to find they had no knowledge of the falsity of the representations or the fraud before making a finding greater in amount than the one hypothecated was sufficiently broad to include appellant's theory. Furthermore, the instruction did not purport to direct a verdict but served only as a guide to the jury, by which it might determine the amount of recovery in the event of a verdict for the plaintiff. The appellant, if he had desired a broader or more elaborate presentation of this theory, would have been entitled to an instruction appropriately embodying it, had he requested it.

14—It is also contended by appellant that the trial court committed error in giving instruction number 2 for defendants for the reason alleged that there is no competent evidence in the record of the total lack of value of the stock in the abstract company to justify it.

The evidence took a wide range as to the value of the stock in said company. Defendants purchased their stock at its par value of one hundred dollars per share. There was evidence that it cost around the sum of ten thousand dollars to produce the entire assets of the corporation, in the shape of books, records, and other proper-

ties. The stock seems to have had no market value. It seems to have been conceded upon the trial that it was and had been at all times a non-dividend paying concern, in fact that it had been unable to pay expenses of operation. The sixty-four shares of stock purchased by defendants, when sold at public auction upon due notice, brought only $231, or around that sum. There was opinion evidence tending to show little, if any, value and other evidence showing a substantial value. The jury, from the evidence, had a wide range to determine value. Both plaintiff and defendants seemed to think so, and that range was from nothing up. Both asked and received instructions upon that theory; and, such being the case, neither can now complain.

The plaintiff's instruction told the jury that, in determining whether the stock was of any value, it must make such finding as of date of the purchase of the same by the defendants while defendants told the jury that, if it found from the evidence that at the time the stock was purchased it was worthless and had no value, the plaintiff could not recover. The complaint against defendants' instruction is, therefore, not now open to the appellant; for giving the jury the right to determine whether the stock had any value implied the right to determine also that it had no value. [Hazel v. Bank of Tipton, 95 Mo. 60; State v. Campbell, 210 Mo. 202, 109 S. W. 706.]

Finding no error in the trial below, the judgment of the lower court should be and is affirmed. *Campbell, C.*, concurs.

PER CURIAM:—The foregoing opinion of REYNOLDS, C., is adopted as the opinion of the court. The judgment is affirmed. All concur.