737 F.2d 1490
 Blue Sky L. Rep. P 72,049, Fed. Sec. L. Rep. P 91,554
The KANSAS STATE BANK IN HOLTON, Appellee,
v.
The CITIZENS BANK OF WINDSOR, J.W. Simmons, and William E.
Simmons, Trustee of the Jean Simmons Trust Estate,
Appellants.
 No. 83-1315.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 14, 1983.
Decided June 29, 1984.
Rehearing and Rehearing En Banc Denied July 31, 1984.
 
 Thomas W. Wagstaff, Penni L. Johnson, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, Mo., for appellants The Citizens Bank of Windsor, J.W. Simmons and William E. Simmons, Trustee of the Jean Simmons Trust Estate.
 William L. Turner, Stephen B. Sutton, Gage & Tucker, Kansas City, Mo., for appellee.
 Before McMILLIAN, JOHN R. GIBSON and BOWMAN, Circuit Judges.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 Appellee The Kansas State Bank in Holton purchased a $200,000 loan participation certificate from appellant The Citizens Bank of Windsor. The borrower, Oldham's Farm Sausage, Inc., subsequently went out of business. Holton Bank lost the entire $200,000 when its priority in collateral securing the loan proved to be junior to that of other lenders. Holton Bank then brought this suit alleging federal and Missouri securities laws violations (counts I and II) and common law fraud (count III). The jury returned a verdict in favor of Holton Bank on all three counts and awarded $200,000 in actual damages, $44,843 in interest and $104,212 in attorney's fees under count II, and $50,000 in punitive damages under count III. On appeal, Windsor Bank principally argues that a loan participation is not a security within the meaning of either federal or Missouri securities laws, that there was insufficient evidence on the issue of fraud, and that the district court should have required an election of remedies. We reverse the judgment on the securities laws counts and affirm on the fraud count.[1]
 
 
 2
 The crux of this lawsuit concerns the representations made by appellant William Simmons to Clarence Norris, President of Holton Bank, at a meeting of Oldham's creditors on November 29, 1979. Norris testified that he agreed to purchase the participation certificate only because he and the other lenders were told by Simmons at the meeting that their respective interests would be secured by a first priority in Oldham's accounts receivable and inventory except for the first $235,000. Within four months, however, Oldham's went out of business and Norris and the other lenders discovered that their secured positions were junior to approximately $827,000 in outstanding loans made to Oldham's by the parents of William Simmons.[2]
 
 
 3
 The dispute is further illuminated by the events preceding the November 29 meeting. In 1978, Windsor Bank extended two loans to Oldham's and, due to its statutory lending limit, simultaneously sold both promissory notes to Traders Bank of Kansas City. The first was a $765,000 note secured by Oldham's equipment and machinery. The second was an $850,000 revolving line of credit secured by Oldham's accounts receivable and inventory. Both security agreements contained cross-collateralization provisions, whereby the collateral securing one note could be used to satisfy the amount due on the other note.
 
 
 4
 In 1979, Windsor Bank agreed to extend a third loan to Oldham's. This was an $850,000 participation loan and was secured by Oldham's accounts receivable and inventory. Windsor Bank funded $150,000 of this loan and two of its correspondent banks each agreed to purchase $250,000 participations. Oldham's President Michael Gibson hoped to sell the remaining $200,000 participation to Holton Bank.
 
 
 5
 In October, 1979, Traders Bank called both of the notes it held from Oldham's. Oldham's did not have the money to pay off the loans. To save Oldham's from foreclosure, the Simmons family personally borrowed $1,000,000 and purchased from Traders Bank both of the notes.[3]
 
 
 6
 Soon thereafter, Simmons arranged for the November 29 meeting of all persons involved in Oldham's financing. He wanted to disclose his family's recent purchase from Traders Bank of both notes and to persuade Holton Bank to purchase the remaining $200,000 participation. Norris testified, as we have discussed, that Simmons told the lenders that their participation interests would be secured by a first priority in Oldham's accounts receivable and inventory except for the first $235,000 worth of that collateral. Lanny Kimbrough, Vice-President of Holton Bank, corroborated Norris' testimony. Norris further testified that representatives of the other participating lenders, Bruce Kent and H.W. Harris, also were under the impression that they held a first position except for $235,000. Simmons asserts that he said nothing about the lender's priority in Oldham's accounts receivable and inventory. He argues that all he did was present the participating lenders with a "Subordination of Lien Agreement." Under its terms, the lenders would agree to subordinate their interests in Oldham's accounts receivable and inventory to the Simmons family's $850,000 interest which it held by virtue of its purchase from Traders Bank of the note secured by that collateral. Simmons explained to the lenders, however, that their actual subordination to the Simmons family would never exceed $235,000. This was because the Simmons family could loan Oldham's a total of no more than $1,000,000 on both notes. Of that amount, $765,000 was already due on the note secured by Oldham's equipment and machinery, and therefore only $235,000 could be loaned on the note secured by Oldham's accounts receivable and inventory. A follow-up letter sent by Simmons to Norris confirmed these representations. On December 3, Norris agreed to purchase the $200,000 participation.
 
 
 7
 Within four months, Michael Gibson informed Simmons that Oldham's could not continue in business. Simmons subsequently told Norris that his family intended to protect its position by invoking the cross-collateralization provision of the security agreement underlying the equipment and machinery note. By doing so, the Simmons family would be able to satisfy the $765,000 balance due on that note out of Oldham's accounts receivable and inventory. It was only then, Norris testified, that he realized that Holton Bank was subordinated not only to the maximum amount the Simmons family would loan Oldham's under the accounts receivable and inventory note ($235,000), but also to the full amount Oldham's owed under the equipment and machinery note ($765,000).[4] Norris claims that this was in direct contradiction to Simmons' representation that the lenders would be in a first position in Oldham's accounts receivable and inventory except for $235,000. Simmons counters that no such representation was made, and that his family never relinquished its right to invoke the cross-collateralization provision and satisfy the $765,000 balance due on the equipment and machinery note out of Oldham's accounts receivable and inventory. The proceeds from the eventual sale of Oldham's accounts receivable and inventory went entirely to the Simmons family. Holton Bank received nothing. This lawsuit resulted.
 
 I.
 
 8
 The first issue is whether Holton Bank's participation interest is a security within the meaning of the Securities Exchange Act of 1934, 15 U.S.C. Secs. 78a-78kk (1982). Section 3(a)(10) of the Act defines security as follows:
 
 
 9
 (a) When used in this chapter, unless the context otherwise requires--
 
 
 10
 ....
 
 
 11
 (10) the term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement ... or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in ... any of the foregoing....
 
 
 12
 15 U.S.C. Sec. 78c(a)(10) (emphasis added). The first court to address the issue literally applied the plain language of this definition and held that loan participations were securities. See Lehigh Valley Trust Co. v. Central National Bank of Jacksonville, 409 F.2d 989 (5th Cir.1969). Not only has the Fifth Circuit since repudiated this literalist approach, see Bellah v. First National Bank of Hereford, 495 F.2d 1109 (5th Cir.1974), but the Supreme Court has indicated that the broad statutory definition of security is limited by the phrase "unless the context otherwise requires" and by congressional intent "not ... to provide a broad federal remedy for all fraud." Marine Bank v. Weaver, 455 U.S. 551, 556, 102 S.Ct. 1220, 1223, 71 L.Ed.2d 409 (1982) (citations omitted). The Court has endorsed an approach to interpreting the federal securities laws that emphasizes "the economic realities underlying a transaction, and not on the name appended thereto." United Housing Foundation v. Forman, 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975).
 
 
 13
 Courts have since devised various tests to identify those commercial transactions involving notes and participations thought to be outside the intended scope of the federal securities laws. One is the "investment-commercial" test whereby promissory notes containing terms indicative of a commercial lending arrangement, e.g., collateralized, short-term, proceeds used for operating expenses, repayable at a fixed rate of interest, are not considered securities. See National Bank of Commerce v. All American Assurance Co., 583 F.2d 1295 (5th Cir.1978); C.N.S. Enterprises, Inc. v. G. & G. Enterprises, Inc., 508 F.2d 1354 (7th Cir.), cert. denied, 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975); Zabriske v. Lewis, 507 F.2d 546 (10th Cir.1974); Lino v. City Investing Co., 487 F.2d 689 (3d Cir.1973). Another is the "risk capital" test. Under this approach, notes representing loans of risk capital are considered securities while those subject only to the normal risks incident to commercial lending are not. See Great Western Bank and Trust v. Kotz, 532 F.2d 1252 (9th Cir.1976). Despite the different label, the risk capital test incorporates criteria similar to that adopted under the investment-commercial test: (1) time; (2) collateral; (3) form of the obligation; (4) circumstances of issuance; (5) relationship between the amount borrowed and the size of the borrower's business; and (6) the intended use of the funds. Great Western, 532 F.2d at 1257-58. A third approach has been adopted by the Second Circuit. Under its test, the plain language of the definition creates the presumption that notes and participations are securities. The burden is then placed on the party seeking to exclude such instruments to show that they "bear a strong family resemblance" to those commercial transactions which Congress presumably did not intend to be covered by the securities laws. Exchange National Bank of Chicago v. Touche Ross & Co., 544 F.2d 1126, 1138 (2d Cir.1976), modified, Chemical Bank v. Arthur Andersen & Co., 726 F.2d 930 (2d Cir.1984); Commercial Discount Corp. v. Lincoln First Commercial Corp., 445 F.Supp. 1263 (S.D.N.Y.1978). Exempt transactions under the Second Circuit's approach, again similar to those identified under the other two tests, include notes evidencing consumer financing, mortgages, and secured short-term loans. Exchange National Bank, 544 F.2d at 1138.
 
 
 14
 Loan participations involve a pooling of funds and a potential lack of direct dealing between borrower and lender,[5] and are therefore analytically distinct from promissory notes. Perhaps for this reason, courts recently examining the status of participations have foregone the above three tests in favor of the one developed by the Supreme Court in SEC v. W.J. Howey, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946).[6] The Howey test defines a security as (1) an investment (2) in a common venture (3) with a reasonable expectation of profits (4) to be derived from the entrepreneurial or managerial efforts of others. Id. at 301, 66 S.Ct. at 1104. We agree that the Howey test is the preferred approach to analyzing the status of loan participations under the Securities Exchange Act,[7] and conclude that Holton Bank's participation interest is not a security as it fails to satisfy three of Howey 's four criteria.
 
 
 15
 The first element of the Howey test--the presence of an investment--presents the task of distinguishing investments from commercial transactions. It therefore incorporates many of the same factors identified in the three tests discussed earlier. We are not required, however, to adopt any of the three tests because the participation interest at issue satisfies none of them. Officers of Holton Bank referred to the transaction as a participation loan and processed it in the same manner as other loans. Although the participation was indirect because it was not independently collateralized and no separate promissory note was issued, the participation certificate indicated that the underlying note was collateralized. The certificate itself was payable on demand at a fixed interest rate of 14 percent. Oldham's intended to use the proceeds as operating funds and not for capital improvement. The circumstances of the transaction indicate nothing more than a bank loan turned sour. Under any of the three tests, all of these factors combine to establish that Holton Bank's participation interest was simply a standard commercial loan and not an investment within the meaning of the Howey test.
 
 
 16
 The third element of the Howey test is that the transaction must involve a reasonable expectation of profit. Profit, however, does not mean any return beyond principal. Rather, it is profit of the type typically associated with an investment. This includes "capital appreciation resulting from the development of the initial investment ... or a participation in earnings resulting from the use of investors' funds...." Forman, 421 U.S. at 852, 95 S.Ct. at 2060. Holton Bank had no prospect of capital appreciation. Nor did it participate in Oldham's earnings: while its 14 percent return undoubtedly would have been paid out of Oldham's earnings, Holton Bank did not participate in those earnings because its return remained fixed. It therefore did not expect a "profit" from the participation as that term is used in the Howey test.
 
 
 17
 The fourth element of the Howey test is that "profits are to be derived from the entrepreneurial and managerial efforts of others." In this case, Holton Bank's return was not based on the efforts of Windsor Bank. The participation certificate limited Windsor's efforts to remitting Holton's share of principal and interest as it was received from Oldham's. Holton Bank's return was based solely on Oldham's ability to repay the loan, and any administrative tasks undertaken by Windsor Bank were not "entrepreneurial or managerial" but simply an efficient way to service a participation loan. The participation interest thus fails to satisfy the fourth element of the Howey test.
 
 
 18
 In light of the foregoing, we conclude that Holton Bank's participation interest was not a security within the meaning of the Securities Exchange Act. It has thus failed to state a claim under section 10(b) of the Act, 15 U.S.C. Sec. 78j(b). The judgment under count I is reversed.
 
 II.
 
 19
 The second issue presented is whether Holton Bank's participation interest is a security within the meaning of Missouri securities law. With only one relevant difference,[8] Missouri's definition of security is identical to that contained in the Securities Exchange Act. See Mo.Rev.Stat. Sec. 409.401(l ) (1978). Despite this identity, Holton Bank argues that, regardless of its status under federal law, a participation interest must be considered a security under Missouri law. It reaches this conclusion by reasoning that because no Missouri court has addressed this issue, our limited role in matters of state law requires that we observe Missouri's rule of strict statutory construction. This rule, we are told, commands that we look no further than the literal statutory language which defines a security to include a "note" and a "certificate of interest or participation in ... [a note]." Id.
 
 
 20
 We are not convinced that a participation interest has a status under Missouri law any different than it has under the Securities Exchange Act. First, we cannot dismiss lightly the fact that the definition of security contained in the two statutes is essentially identical. Second, we reject Holton Bank's insistence that Missouri courts look only to the plain language of a statute in ascertaining its meaning. While plain language is the first and best source to consult in discerning legislative intent, the statute's purpose and objectives are also to be considered. Eminence R-1 School District v. Hodge, 635 S.W.2d 10 (Mo.1982); Person v. Scullin Steel Co., 523 S.W.2d 801 (Mo. en banc 1975); Rosedale-Skinker Improvement Ass'n. v. Board of Adjustment, 425 S.W.2d 929 (Mo. en banc 1968). Absent any guidance from Missouri courts, we assume that they would ascertain that purpose with reference to the nearly identical federal definition of securities. We also note that Missouri courts have looked to federal securities law for such guidance. See Florida Realty, Inc. v. Kirkpatrick, 509 S.W.2d 114, 118 (Mo.1974) (citing SEC v. Joiner Leasing Corp., 320 U.S. 344, 353, 64 S.Ct. 120, 124, 88 L.Ed. 88 (1963)). We believe Missouri courts would find persuasive the substantial body of federal court decisions that we have discussed in Part I of this opinion.
 
 
 21
 We further observe that the Missouri legislature failed to adopt the following provision of the Uniform Securities Act from which its securities laws were derived:
 
 
 22
 "This act shall be construed as to effectuate its general purpose to make uniform the law of those states which enact it and to coordinate the interpretation and administration of this act with the related federal regulation."
 
 
 23
 Unif.Securities Act Sec. 415, 7A U.L.A. 695 (1978). We do not, however, view the failure of the Missouri legislature to adopt section 415 to be of controlling significance. As indicated above, this omission has not prevented Missouri courts from considering federal decisions in interpreting its securities laws. In addition, one commentator has suggested that Missouri's failure to adopt section 415 was based not on its desire to reject the federal definition of security, but simply to retain its local policy of a "strict qualification to registration of securities, subject to numerous and steadily increasing exemptions." Bateman, The Missouri Uniform Securities Act, 34 Mo.L.Rev. 463, 475 & n. 81 (1969).
 
 
 24
 We acknowledge that, in the absence of controlling state precedent, we accord substantial deference to the district court's interpretation of state law. See Renfroe v. Eli Lilly & Co., 686 F.2d 642, 648 (8th Cir.1982). We are not, however, bound by that interpretation and "must reverse if we find that [it] has not correctly applied local law." Bazzano v. Rockwell International Corp., 579 F.2d 465, 469 (8th Cir.1978); Luke v. American Family Mutual Insurance Co., 476 F.2d 1015, 1019 & n. 6 (8th Cir.1972), cert. denied, 414 U.S. 856, 94 S.Ct. 158, 38 L.Ed.2d 105 (1973). In this case, the issue of loan participations under Missouri law was presented on a motion for a directed verdict. The district court orally denied the motion, and the record does not contain an articulation of its analysis. We do not have a well-researched memorandum that expresses a carefully reasoned ruling on a question of state law. We have a ruling made in the heat of trial. We believe our deference to such rulings should yield to reasoning we find more compelling.
 
 
 25
 We conclude that Missouri courts would define the status of Holton Bank's participation interest under its securities laws with reference to the Securities Exchange Act and would hold that it is not a security under Missouri law. Accordingly, the judgment in favor of Holton Bank under count II, including the awards of prejudgment interest and attorney's fees, is reversed.
 
 III.
 
 26
 Windsor Bank's third claim is that the evidence of fraud was insufficient to submit the case to the jury. The elements of fraud under Missouri law are as follows: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) the hearer's consequent and proximate damage. Crues v. KFC Corp., 729 F.2d 1145, 1148 (8th Cir.1984); Cantrell v. Superior Loan Corp., 603 S.W.2d 627, 634 (Mo.App.1980). In determining if these elements are supported by sufficient evidence to create a jury question, we must view the evidence in a light most favorable to the non-moving party. Decker-Ruhl Ford Sales, Inc. v. Ford Motor Credit Co., 523 F.2d 833, 836 (8th Cir.1975). In so viewing the evidence, we must:
 
 
 27
 (1) resolve direct factual conflicts in favor of the nonmovant, (2) assume as true all facts supporting the nonmovant which the evidence tended to prove, (3) give the nonmovant the benefit of all reasonable inferences, and (4) deny the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusion that could be drawn.
 
 
 28
 Dace v. ACF Industries, 722 F.2d 374, 375 (8th Cir.1983), supplemented, 728 F.2d 978 (1984). The same standard is applied under Missouri law. Bayne v. Jenkins, 593 S.W.2d 519, 521 (Mo. en banc 1980).
 
 
 29
 Windsor Bank makes two arguments based on the first element of the verdict-directing instruction on fraud, which reads as follows:
 
 
 30
 [You may find for the plaintiff if] the defendant or defendants against whom you may find represented to plaintiff on November 29, 1979, that if plaintiff purchased a $200,000 certificate of participation from Citizens Bank of Windsor it would be secured by a first lien on Oldham's accounts receivable and inventory, except to the extent of $235,000. (emphasis added).
 
 
 31
 Windsor Bank first argues that Simmons did not make any false representations to Norris. It asserts that the letter dated November 29 contains the only representations made at the November 29 meeting, and it states only that the Simmons family "[is] not loaning and will not loan Oldham's more than $235,000 on a revolving accounts receivable basis." Windsor Bank contends that this representation was never violated.
 
 
 32
 This claim is unpersuasive. Norris and Kimbrough testified that Simmons told them that they would have a first priority in all of Oldham's accounts receivable and inventory beyond $235,000. Other testimony indicated that officials of the other participating lenders were under the same impression. Testimony was also offered that, following the meeting, Simmons responded to a private question concerning the priority of the notes held by his family with the statement "whether or not the bank realizes it, they will and/or have subordinated to a greater degree than what they think they have." The evidence presents a jury question as to whether Simmons represented to Norris that Holton Bank would be in a first position in Oldham's accounts receivable and inventory except for $235,000.
 
 
 33
 Windsor Bank next asserts that, even if Simmons did make such a representation to Norris, it was only a future promise which is not an actionable representation under Missouri law. Windsor Bank's argument is based on Reed v. Cooke, 55 S.W.2d 275, 278 (Mo. en banc 1932), where the Missouri Supreme Court stated that an alleged fraudulent representation must relate to a "present or pre-existing fact, ... and 'cannot ordinarily be predicated on unfulfilled promises or statements as to future events.' " Later decisions, however, have defined a present fact to include a state of mind or intent as to a future event. See White v. Mulvania, 575 S.W.2d 184, 188 (Mo. en banc 1978) (collecting cases). Windsor Bank characterizes White as "relaxing" the rule established by Reed v. Cooke, supra. We believe a more accurate characterization is that the rule, if not overruled, was so limited and narrowed by White that it cannot support Windsor Bank's argument.
 
 
 34
 Windsor Bank's final assertion is that Norris had no right to rely on the representation he alleges Simmons made. It contends that Norris had access to, or could easily have acquired, the security agreement underlying the equipment and machinery note. In turn, Windsor Bank reasons that an examination of this document would have revealed that the Simmons family retained the right to satisfy the $765,000 balance due on the equipment and machinery note out of Oldham's accounts receivable and inventory.
 
 
 35
 As a general proposition, it is true that " 'neither law nor equity will afford relief for false representations where the parties stand upon equal footing or where the subject matter in dispute is equally known to both.' " Universal C.I.T. Credit Corp. v. Tatro, 416 S.W.2d 696, 703 (Mo.App.1967) (quoting Cantley v. Plattner, 228 Mo.App. 411, 67 S.W.2d 125 (1934)). Under such circumstances, the victim is required to exercise a reasonable degree of caution in light of the circumstances. Wood v. Robertson, 245 S.W.2d 80 (Mo.1952). This duty, however, is not imposed where "the fraud consists of a positive representation intended to induce the very conduct which then results." Alexander v. Sagehorn, 600 S.W.2d 198, 201 (Mo.App.1980). See United Industrial Syndicate v. Western Auto Supply Co., 686 F.2d 1312, 1318 (8th Cir.1982); Universal C.I.T. Credit Corp., 416 S.W.2d at 703 (collecting cases). The issue therefore is whether the evidence permitted the jury to conclude that the representations made by Simmons had the effect of inducing Norris to forego any further investigation into the priority of the bank's secured position in Oldham's accounts receivable and inventory.
 
 
 36
 As indicated previously, Norris testified that Simmons told him at the meeting that they would be in a first position except for $235,000. The evidence showed that the representatives of the other participating banks were under the same impression. The entire text of the November 29 letter, while not explicitly confirming the banks' understanding of what Simmons told them, could be read by the jury as assuring Norris that his priority in Oldham's accounts receivable and inventory would only be subordinated up to $235,000. Simmons did not give Norris a copy of the security agreement underlying the equipment and machinery note which contained the cross-collateralization provision. In addition, Simmons was intimately involved with all of the financial transactions between Oldham's and his parents and had prepared the security agreement containing the cross-collateralization provision. This evidence presents a jury question as to whether Simmons' representations "anesthetize[d] [Norris's] sense of caution," Kestner v. Jakobe, 446 S.W.2d 188, 195 (Mo.App.1969), and therefore gave him a right to rely without further investigation.
 
 IV.
 
 37
 Windsor Bank next contends that the district court erred in failing to compel Holton Bank to make an election of remedies. It claims that Holton asserted inconsistent theories of relief by seeking both rescission of the participation agreement--thus disaffirming the agreement--under counts I and II, and damages for fraud--thus affirming the agreement--under count III.
 
 
 38
 "A confusing congeries of doctrines have been lumped together under the election of remedies label." 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure, Sec. 4476 at 772 (1981). Windsor Bank borrows from all of the doctrine's various applications in raising this claim. The first application represents the requirement that a party choose among cumulative statutory or common law rights. See, e.g., Mohn v. Marla Marie, Inc., 625 F.2d 900, 901 (9th Cir.1980). This is essentially a preemption question. In this case, both the Securities Exchange Act and Missouri Blue Sky Laws specifically provide that other remedies may be pursued.[9] A second and related use of the doctrine is to prevent double recovery for a single injury. See, e.g., Twin City Federal Savings and Loan Assn. v. Transamerica Insurance Co., 491 F.2d 1122 (8th Cir.1974). In this case, only a single judgment was entered on the jury's verdict in favor of Holton Bank on all three counts. Finally, the election doctrine has been used to prevent parties from pleading inconsistent theories of relief. This application has been eviscerated by the permissive rules of pleading under Fed.R.Civ.P. 8(a) and 8(e)(2). See In re King Enterprises, 678 F.2d 73, 76-77 (8th Cir.1982). Windsor Bank also cites a number of Missouri cases purportedly mandating an election of remedies under these circumstances. The necessity of determining whether state or federal election of remedies law applies to this case which rests, in part, on diversity jurisdiction, see generally Transit Casualty Co. v. Transamerica Insurance Co., 387 F.2d 1011, 1017-18 (8th Cir.1967), is eliminated because the record reveals that the jury instructions actually submitted omitted any reference to rescission and sought only money damages on all three counts. Any possibility of prejudice, jury confusion or double recovery was thus eliminated. Under Missouri law, a failure to require Holton Bank to elect a remedy under these circumstances is clearly harmless error. See Grand River Township v. Cooke Sales and Service, Inc., 267 S.W.2d 322 (Mo.1954).
 
 V.
 
 39
 Windsor Bank's fifth and final claim is that the district court erred in denying its request to submit the issue of attorney's fees awarded under count II to the jury. This claim is mooted by our decision to reverse the judgment under count II.
 
 
 40
 We have considered all of the remaining arguments made by both parties and find them to be without merit.
 
 
 41
 In summary, we hold that Holton Bank's participation interest was not a security within the meaning of the Securities Exchange Act and Missouri Blue Sky Laws. The judgments under counts I and II are reversed, including the awards of prejudgment interest and attorney's fees. The evidence was sufficient to allow the jury to decide the claim of fraud under count III. The judgment under count III, including the award for punitive damages, is affirmed.
 
 
 
 [1]
 In count IV of its complaint, Holton Bank alleged that the public sale of Oldham's assets was commercially unreasonable. The jury returned a verdict against it on this count
 
 
 [2]
 All of the appellants in this action are related. Appellant J.W. Simmons is President of Windsor Bank. J.W. and the Jean Simmons Trust Estate are controlling stockholders in Windsor Bancshares, a bank holding company that owns Windsor Bank. Appellant William Simmons, son of J.W., was sued in his capacity as trustee of the Jean Simmons Trust Estate. He is a Vice-President and Secretary of Windsor Bank and an officer and director of Windsor Bancshares. He is also a practicing attorney and represented Windsor Bank, Oldham's and his parents at various times throughout the events leading up to this suit
 
 
 [3]
 The notes were actually purchased by J.W. Simmons, Jean Simmons, and the Jean Simmons Trust Estate
 
 
 [4]
 Although Oldham's had a maximum of $235,000 available from the Simmons family under the accounts receivable and inventory line of credit, it had only borrowed $62,000 of that amount when it ceased business. The amount of Oldham's indebtedness to the Simmons family under both notes thus totalled $827,000
 
 
 [5]
 In a "direct" participation, the borrower deals directly with the lenders and a separate promissory note is issued to each. In an "indirect" participation, the borrower deals only with a lead lender who in turn sells participation interests to other lenders. The participating lenders may not execute separate promissory notes or security agreements with the borrower. See Pollock, Notes Issued in Syndicated Loans--A New Test to Define Securities, 32 Bus.Law. 537, 538-39 (1976-1977)
 
 
 [6]
 See Union Planters National Bank of Memphis v. Commercial Credit Business Loans, Inc., 651 F.2d 1174 (6th Cir.), cert. denied, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981); American Fletcher Mortgage Co. v. U.S. Steel Credit Corp., 635 F.2d 1247 (7th Cir.1980), cert. denied, 451 U.S. 911, 101 S.Ct. 1982, 68 L.Ed.2d 300 (1981); United American Bank of Nashville v. Gunter, 620 F.2d 1108 (5th Cir.1980); Robbins v. First American Bank of Virginia, 514 F.Supp. 1183 (N.D.Ill.1981); Manchester Bank v. Connecticut Bank and Trust Co., 497 F.Supp. 1304 (D.N.H.1980); Provident National Bank v. Frankfort Trust Co., 468 F.Supp. 448 (E.D.Pa.1979); FBS Financial, Inc. v. CleveTrust Realty Investors, Fed.Sec.L.Rep. (CCH) p 96341 (N.D.Ohio 1977). These decisions all held that the participation interest at issue was not a security
 
 
 [7]
 Holton Bank argues that the Howey test applies only when determining if an "investment contract" is a security. We reject this claim. While the Howey test did arise out of an attempt to define an investment contract, the Supreme Court has since indicated that its application is not so limited: "[The Howey ] test, in shorthand form, embodies the essential attributes that run through all of the Court's decisions defining a security." Forman, 421 U.S. at 852, 95 S.Ct. at 2060
 
 
 [8]
 Missouri law defines a security to include "evidence of indebtedness." This phrase is omitted from the Securities Exchange Act but included in the definition of security used in the Securities Act of 1933. See 15 U.S.C. Sec. 77b(1) (1982). Despite this difference between the two federal acts, their definitions have been held to be virtually identical. Tcherepnin v. Knight, 389 U.S. 332, 342, 88 S.Ct. 548, 556, 19 L.Ed.2d 564 (1967). In light of our conclusion that Missouri courts would determine the status of participation interests with reference to federal law, we are convinced that the "evidence of indebtedness" phrase has little bearing on the issue before us
 
 
 [9]
 15 U.S.C. Sec. 78bb(a) provides that "[t]he rights and remedies provided by this chapter shall be in addition to any and all rights and remedies that may exist at law or in equity...." Mo.Rev.Stat. Sec. 409.411 provides "[t]he rights and remedies provided by this Act are in addition to any other rights or remedies that may exist at law or in equity...."